**TELEPHONE AND DATA SYSTEMS, INC., United States Cellular Corporation, Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

American Cellular Network Corp., doing business as Comsat Cellular Communications, Inc.; and Ellis Thompson Corp., Intervenors.

Nos. 92–1273, 93–1192.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1993.

Decided March 25, 1994.

Alan Y. Naftalin, Washington, DC, argued the cause for appellants. With him on the briefs were Herbert D. Miller, Jr. and Peter M. Connolly.

James M. Carr, Counsel, Federal Communications Commission, Washington, DC, argued the cause for appellee. On the brief were Renee Licht, Acting General Counsel at the time the brief was filed, Federal Communications Commission; Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission; and Sue Ann Kanter and Sara F. Seidman, Counsel, Federal Communications Commission. John E. Ingle, Deputy Associate Counsel; and Roberta L. Cook, Counsel, Federal Communications Commission, entered an appearance.

On the brief of joint intervenors were Louis Gurman, Diane F. Kiechel, Stuart F. Feldstein, and Robert J. Keller. Thomas J. Hutton, Washington, DC, entered an appearance.

Before WALD, EDWARDS, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Telephone and Data Systems, Inc. ("TDS") appeals two orders of the Federal Communications Commission ("the Commission" or "FCC").[1] The first order denied TDS's application for review of the Common Carrier Bureau's decision to grant Mr. Ellis Thompson a conditional permit to construct and operate cellular communications services in the Atlantic City market. *See Ellis Thompson Corp.*, 7 FCC Rcd 3932 (1992) ("the Atlantic City order"). The second order rejected TDS's petition to deny the application of Metromedia Co. to transfer control of a cellular licensee in Philadelphia to Comcast Cellular Communications, Inc. *See Metromedia Co.*, 8 FCC Rcd 870 (1993) ("the Philadelphia order").

We hold that TDS has standing to challenge the Atlantic City order but not the Philadelphia order. On the merits, we hold that the Atlantic City order departed from Commission precedent without adequate explanation. We therefore vacate the Atlantic City order, and remand the cause for further proceedings.

## I.

In 1986, Ellis Thompson entered a Commission lottery for the license to construct and operate a "non-wireline" cellular telephone system in Atlantic City, New Jersey. Before the drawing, Thompson agreed with some one hundred other applicants that the winner would receive 50.01% control of the licensee, while the losers would divide the remainder among themselves. The agreement also provided that "selling control of the licensee" would require approval by a two-thirds supermajority vote. Thompson won the lottery and formed the Ellis Thompson Corporation, of which he is the sole shareholder, to hold his interest in the licensee.

Thompson then entered into an agreement with TDS that gave TDS an option to buy Thompson's interest after the cellular network was completed. As subsequently amended, paragraph 16 of the agreement provided that

> [w]ithout the prior consent of [TDS], which consent shall not be unreasonably withheld, no agreement shall be entered into with respect to the System, which relates to the provision of goods or services requiring an aggregate expenditure of $50,000 or more. Any such agreement shall be, by its terms, cancellable [sic] upon sixty (60) days written notice from [TDS] at any time after the exercise of [TDS's] options hereunder.

After the option was given, however, the American Cellular Network Corporation ("Amcell") bought up 36.01% of the minority interests in Thompson's licensee. In 1987, Amcell informed TDS that under the supermajority provision of Thompson's agreement with the other lottery entrants Amcell's consent would be required before TDS could buy the cellular system. Thompson then agreed to a contract with Amcell under which Amcell would construct the Atlantic City system and operate it for at least ten years. In compliance with paragraph 16 of his agreement with TDS, Thompson submitted the Amcell management agreement to TDS for approval. TDS refused to consent, but Thompson signed the Amcell agreement anyway. Thompson also gave Amcell a contingent option to buy his interest if TDS did not or could not exercise its option. Finally, Amcell agreed to indemnify Thompson if the FCC denied his application because it found the management agreement objectionable. Neither the option nor the indemnity agreement was disclosed to the FCC.

### A. The Atlantic City Proceeding

Amcell petitioned the Commission's Mobile Services Division to grant Thompson's application to construct the Atlantic City system.

1. United States Cellular Corp. ("USCC"), a subsidiary of TDS, and Vineland Cellular Telephone Co. ("Vineland"), a subsidiary of USCC, are also appellants of record. Save when describing the history of the proceedings, we shall refer only to TDS.

Amcell also proposed that the Commission require, as a condition on the grant, that paragraph 16 of Thompson's agreement with TDS be abrogated. TDS, in opposition, asked the Commission to abrogate the supermajority clause of Thompson's agreement with the minority owners. Each claimed that the other's provision violated section 310 of the Communications Act of 1934, 47 U.S.C. § 310(d) (1988), which prohibits applicants like Thompson from transferring to another *de jure* or *de facto* control of their systems without FCC approval. The Mobile Services Division accepted Amcell's proposal but rejected TDS's request. *See Ellis Thompson,* 3 FCC Rcd 3962 (1988).

TDS appealed to the Chief of the Common Carrier Bureau. The Bureau, concluding that paragraph 16 unlawfully interfered with Thompson's ability to conduct the business of his licensee, affirmed both the grant of Thompson's application and the abrogation of the paragraph. *See Ellis Thompson,* 4 FCC Rcd 2599 (1989). The Bureau also declined to abrogate the supermajority provision, noting that it restricted only Thompson's right to sell and not his right to make daily business decisions. *See id.* at 2601.

TDS appealed the Bureau's order to the Commission while it simultaneously sued Amcell in the federal district court for the District of Columbia. In that suit, TDS alleged two causes of action relevant here: first, that Amcell had tortiously interfered with TDS's contractual relations with Thompson; and second, that Amcell had tortiously interfered with TDS's prospective business relations with Thompson. The district court dismissed the complaint, holding that because the order of the Common Carrier Bureau had abrogated paragraph 16 and was entitled to *res judicata* effect, TDS no longer had any contractual interest in the Atlantic City system. On appeal, we held that the district court had erred by dismissing TDS's claim for interference with prospective business relations, which did not depend on the abrogated paragraph 16. However, we upheld the dismissal of the claim of tortious interference with contractual relations. *See Telephone & Data Sys., Inc. v. American Cellular Network Corp.,* 966 F.2d 696, 700 (D.C.Cir.1992).

While the collateral litigation proceeded, TDS applied to the Commission for review of the Common Carrier Bureau's decision. After the pleading deadline, but before the Commission had ruled, TDS filed a "supplement" that notified the Commission of the option and indemnity agreements between Amcell and Thompson; TDS alleged that these agreements, in combination with the management agreement, showed that Amcell enjoyed *de facto* control of Thompson in violation of § 310(d). TDS requested the Commission to "require Amcell to cease exercising control of Thompson's cellular system and [to] abrogate all of the agreements between Amcell and Thompson under which Amcell has exercised control." In the alternative, TDS made a formal Request for Inquiry Under § 403 of the Act, asking the Commission to investigate Amcell's dealings with Thompson.

The Commission denied TDS's application for review. *See Ellis Thompson Corp.,* 7 FCC Rcd 3932 (1992). It agreed with the Bureau that paragraph 16 infringed Thompson's ability to conduct his business but that the supermajority provision did not. The Commission also rejected TDS's allegations of *de facto* control, for the six-factor inquiry mandated by Commission precedent showed that Thompson retained sufficient control. Because of that conclusion, the Commission dismissed as moot TDS's request for a § 403 investigation. *See* 7 FCC Rcd at 3936 n. 4. TDS now appeals the order.

### B. The Philadelphia Proceeding

A year before the decision in the Atlantic City proceeding, Metromedia Co. asked the Commission to approve a transfer of AWACS Inc., a Metromedia subsidiary licensed to operate the Philadelphia cellular system, to Comcast Cellular Communications, Amcell's parent corporation. TDS's subsidiary United States Cellular Communications (USCC) and USCC's subsidiary Vineland Cellular Telephone (Vineland) petitioned the Commission to deny Metromedia's request. USCC alleged that Comcast, through Amcell, had taken illegal actions in the Atlantic City mar-

ket that showed defects of character warranting denial of the transfer. The Commission, in an order rendered after its order in the Atlantic City proceeding, simply noted that it had there found Amcell blameless and thus denied USCC's petition. *See Metromedia Co.,* 8 FCC Rcd 870, 870 (1993). TDS appeals the Philadelphia order as well.

## II.

The Commission argues that TDS lacks Article III standing to obtain review of the two orders. In both instances TDS must show a palpable injury that is fairly traceable to the Commission's conduct and redressable by the relief requested. *See Lujan v. Defenders of Wildlife,* — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

### A. The Atlantic City Order

TDS seeks review of three determinations made in the Atlantic City order: first, that the grant of Thompson's application should be conditioned on the abrogation of paragraph 16 of the option agreement between Thompson and TDS; second, that the application should *not* be conditioned on the abrogation of the supermajority agreement between Thompson and the other lottery applicants; and third, that Amcell had not violated § 310(d) of the Communications Act by exercising *de facto* control over the Atlantic City cellular system. We hold that TDS has standing to challenge all three components of the order.

The abrogation of paragraph 16 eliminated a contractual right that TDS possessed. That right had commercial value both as a direct restriction on Thompson and as the predicate for a common law action against third parties who might interfere with the contractual relation between Thompson and TDS. Loss of a valuable contractual interest in a licensee is an injury sufficient to invoke our jurisdiction. *See, e.g., Granik v. FCC,* 234 F.2d 682, 684 (D.C.Cir.1956).

The Commission argues that the injury would not be redressed by a favorable decision on the merits, as TDS's chances for ultimate control of the license depend on Thompson's willingness to sell and Amcell's willingness to waive its right to block the sale under the supermajority clause. Although TDS secured Thompson's assent to the provision as a first step toward the eventual acquisition of his license, the provision itself had value that reversal of the order would reinstate. Redress of the injury "does not depend on the actions of third parties not before the court," *Orange Park Florida T.V., Inc. v. FCC,* 811 F.2d 664, 672 n. 18 (D.C.Cir. 1987), and TDS has standing to challenge the abrogation of paragraph 16.

The second and third determinations made in the order are best considered as a package, for TDS views Amcell's use of the supermajority clause as one facet of Amcell's exercise of *de facto* control over Thompson. In essence TDS maintains that the Commission's improper application of § 310(d) has unlawfully permitted Amcell to injure TDS by wielding the supermajority clause to block TDS from exercising its option to acquire Thompson's interest in the license.

The Commission does not dispute that TDS's claim of injury is adequately concrete, but instead argues that the injury is not fairly traceable to the Commission's order and that even a successful challenge to the order will not redress the harm. Recent decisions have clarified the application of the traceability and redressability requirements to suits that complain of administrative action that allows third parties to harm the complainant. Because the standing inquiry in such cases turns on the "'unfettered choices made by independent actors not before the courts,'" *Defenders of Wildlife,* — U.S. at —, 112 S.Ct. at 2137 (quoting *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989)), the party seeking review bears a heightened burden to adduce facts that demonstrate the causal link between the agency action and the injury and that show the injury will "likely" be redressed by the relief sought. *See id.,* — U.S. at —, 112 S.Ct. at 2136–37; *The Freedom Republicans, Inc. v. Feder-*

*al Election Comm'n,* 13 F.3d 412, 416 (D.C.Cir.1994); *Branton v. FCC,* 993 F.2d 906, 910 (D.C.Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994). Nonetheless, "mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice." *National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988).

In this case we need not attempt any broad explication of the justiciability of indirect injury, for one narrow proposition at least is clear: injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 1928 n. 25, 48 L.Ed.2d 450 (1976) (noting cases providing that privately inflicted injury is traceable to government action if the injurious conduct "would have been illegal without that action"); *Public Citizen v. FTC,* 869 F.2d 1541, 1547 & n. 9 (D.C.Cir.1989); *Humane Soc'y of the United States v. Hodel,* 840 F.2d 45, 51 n. 5 (D.C.Cir.1988); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 810–11 (D.C.Cir. 1983), *cert. denied,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). The Atlantic City order, applying the Act and the Commission's precedent, affirmatively upheld the legality of the very provisions whose exercise has inflicted injury on TDS, provisions that a contrary holding would have abrogated.

The Commission protests that TDS's injuries could not be redressed by a favorable resolution of the claim under § 310(d). Under "general Commission policy," *see* Comm.Br. at 22, a determination that Thompson unlawfully ceded control to Amcell would require outright denial of Thompson's application for the license. As TDS's option only has value if Thompson obtains the license, TDS's injury cannot be redressed by the present suit.

The Commission concedes that under the Communications Act it has the power to remedy the violation by simply ousting Amcell from control of Thompson, thus preserving the value of TDS's option; and Commission counsel has provided no authority even for the weaker assertion (first advanced in the appellate proceedings) that under "general policy" the application would be denied. The contingency upon which the Commission relies to defeat standing relates solely to the Commission's own conduct in the future, rather than to the "unfettered choices made by independent actors not before the courts." *Defenders of Wildlife,* — U.S. at —, 112 S.Ct. at 2137. Because the source of the contingency vitiates the rationale for more "exacting scrutiny" of redressability in genuine third-party standing cases, *Freedom Republicans,* 13 F.3d at 416, decisions in like cases have held the suit to be justiciable so long as the relief sought would constitute a "necessary first step on a path that could ultimately lead to relief fully redressing the injury." *Hazardous Waste Treatment Council v. EPA,* 861 F.2d 270, 273 (D.C.Cir.1988); *see also International Ladies' Garment Workers' Union,* 722 F.2d at 811 n. 27. TDS may not prevail even if we vacate the Atlantic City order, but it cannot prevail unless we do so, and that is enough to ensure that the relief requested "will produce tangible, meaningful results in the real world." *Common Cause v. DOE,* 702 F.2d 245, 254 (D.C.Cir.1983).

B. The Philadelphia Order

TDS claims standing to challenge the order based on injuries suffered by its subsidiary Vineland Cellular Telephone Co. Vineland owns a cellular system in Vineland, New Jersey, that borders on systems in Philadelphia, Atlantic City, and Wilmington, Delaware. Comcast, Amcell's parent company, operates the Wilmington system and, if TDS's allegations are credited, the Atlantic City system as well. TDS claims that the transfer of the Philadelphia system from Metromedia Co. to Comcast injured Vineland in two ways. First, Vineland competes with the surrounding systems for customers and would suffer increased competition should those systems be consolidated under common ownership. Second, TDS alleges that Vineland is dependent on "roaming" revenues

from the contiguous systems,[2] and if the contiguous systems pass under Comcast's control the combined market power of those systems could be used to force Vineland to lower the rates it charges to roamers.

The first claim is not fairly traceable to the Commission's action. Vineland suffered competition from the contiguous systems before and after the transfer from Metromedia to Comcast; TDS has not given us any concrete reason to suppose that the transfer would likely increase the pressures on Vineland. *See California Ass'n of the Physically Handicapped, Inc. v. FCC,* 778 F.2d 823, 827 (D.C.Cir.1985) (denying standing to challenge transfer of ownership when injury alleged "occurred before, existed at the time of, and continued unchanged after the challenged Commission action"); *America West Airlines, Inc. v. Burnley,* 838 F.2d 1343, 1344–45 (D.C.Cir.1988) (per curiam) (airline aggrieved by merger of two competitors lacked standing to challenge agency approval of merger).

The second allegation of injury amounts to nothing more than "unadorned speculation." *Simon,* 426 U.S. at 44, 96 S.Ct. at 1927. The sort of concerted anticompetitive action by Comcast subsidiaries that TDS fears might present a risk of antitrust liability. The claim that Commission approval of the Philadelphia transfer encouraged anticompetitive collusion invites us "to presume illegal activities" on the part of actors not before the court, *United Transp. Union v. ICC,* 891 F.2d 908, 914 (D.C.Cir.1989), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990), and is unpersuasive for that reason. *See id.* at 913–15. *Cf. International Ladies' Garment Workers' Union,* 722 F.2d at 811 (possibility that third parties may violate the law is too speculative to defeat standing).[3] We hold that TDS lacks standing to challenge the Philadelphia order.

### III.

Section 310(d) of the Communications Act provides:

> No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission....

47 U.S.C. § 310(d) (1988). Section 310(d) has been held to prohibit *de facto* as well as *de jure* transfers of control. *See Lorain Journal Co. v. FCC,* 351 F.2d 824, 828 (D.C.Cir.1965), *cert. denied,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966).

■ TDS maintains that in the Atlantic City order the Commission erred when it determined that Thompson had not transferred *de facto* control to Amcell. The Commission's order set forth six indicia of *de facto* control taken from *Intermountain Microwave,* 24 Rad.Reg. 7 (P & F) 983, 984 (1963) and reaffirmed in a subsequent policy statement. *See Cellular Control Notice,* 1 FCC Rcd 3 (1986). The six factors are these:

(1) Does the licensee have unfettered use of all facilities and equipment?

(2) Who controls daily operations?

(3) Who determines and carries out the policy decisions, including preparing and filing applications with the Commission?

(4) Who is in charge of employment, supervision, and dismissal of personnel?

(5) Who is in charge of the payment of financing obligations, including expenses arising out of operating? and

(6) Who receives monies and profits from the operation of the facilities?

*See Ellis Thompson Corp.,* 7 FCC Rcd at 3935 (setting out factors).

2. "A subscriber to one cellular system who is visiting in another market is said to be 'roaming.' The switch in the market the roamer is visiting will allow the roamer to use his phone provided the switch operator has a roaming agreement with his home operator." *Metromedia Co.,* 7 FCC Rcd at 716 n. 1.

3. We do not suggest that integration of the adjacent systems alone would constitute unlawful activity, only that the sort of collusive coercion postulated by petitioner might.

Commission precedent declares that actual control is the touchstone of the *Intermountain* test. *See, e.g., News International, PLC,* 97 F.C.C.2d 349, 355–56 (1984); *Stereo Broadcasters, Inc.,* 55 F.C.C.2d 819 (1975). The Commission may overrule or limit its prior decisions by advancing a reasoned explanation for the change, but it may not blithely cast them aside. *See, e.g., Rainbow Broadcasting Co. v. FCC,* 949 F.2d 405, 408 (D.C.Cir.1991); *Telecommunications Research & Action Center v. FCC,* 800 F.2d 1181, 1184 (D.C.Cir.1986). The Atlantic City order transmuted the actual control standard into a test of legal control, or control in principle, without adequate explanation.

The first *Intermountain* factor is whether the licensee has "unfettered use of all facilities and equipment." The record indicates that Amcell has integrated the Atlantic City system into its cellular system in Wilmington, Delaware. Amcell owns the switch used to operate the Atlantic City system and the hardware, software and communications equipment that connect the switch to the Wilmington system. Nonetheless the Commission found the "unfettered use" factor to weigh in Thompson's favor, stating that:

> [I]t is clear that [Ellis Thompson Corporation], the licensee, has *unfettered access* to the system's facilities and equipment. Indeed, Mr. Thompson makes regular visits to the system.

*Ellis Thompson Corp.,* 7 FCC Rcd at 3935 (emphasis added). The discussion leaves obscure whether the Commission believes "access" and "use" to be equivalent, or whether a change in policy was intended. The Commission on remand must explain its current understanding of the unfettered use factor.

The second factor is whether the applicant "controls daily operations." Here the Commission reasoned:

> While Amcell does manage day-to-day operations, such operations are subject to Mr. Thompson's ultimate supervision and control. Mr. Thompson approves the annual budget and major expenditures, receives periodic reports detailing the status of operations and maintains regular contact with the Amcell management team.

*Ellis Thompson Corp.,* 7 FCC Rcd at 3935. On its face, "control of daily operations" must mean more than approval of major expenses and a loosely defined practice of maintaining "contact." Thompson resides in Washington State and admitted, by affidavit, that he is "not actively involved in the day to day management" of his system. The order failed to reconcile Thompson's case with *Brian L. O'Neill,* 6 FCC Rcd 2572 (1991). There a cellular system lottery winner, without prior experience, entered into a management agreement with a large cellular telephone company. Like Thompson, O'Neill formally retained rights of supervision and control under the contract. Nonetheless O'Neill was found to have effected an unauthorized transfer of control under the six *Intermountain* factors. The Commission noted O'Neill was rarely at the system, had few duties other than to approve expenses and had "in effect, walked away from certain critical responsibilities." *See Brian L. O'Neill,* 6 FCC Rcd at 2592–94. The Commission has not differentiated Thompson's role in the present case from O'Neill's disfavored walking away.

The third *Intermountain* factor is whether the applicant "determines and carries out the policy decisions, including preparing and filing applications with the Commission." Thompson's agreements with Amcell provide that Amcell would supervise and manage the system, perform all personnel and accounting tasks, initiate advertising and sales promotions, and "shall, subject to [Thompson's] review, approval and execution, complete and file all reports, applications and other filings required to be made with the [FCC]." Moreover, Amcell had, by contract, "sole control" over the defense and settlement of any lawsuit against Thompson arising from his relationship to Amcell.

In the face of this evidence, the FCC stated:

> *Policy Decisions.* Mr. Thompson is involved in making all major policy decisions and meets quarterly with Amcell management to discuss all aspects of the business over the past quarter and to discuss marketing and construction plans for the current quarter. While Amcell prepares FCC applications, they are reviewed by Mr.

Thompson's independent FCC counsel, signed by Mr. Thompson and filed by his counsel.

*Ellis Thompson Corp.*, 7 FCC Rcd at 3935. Somehow the factor to be applied—"determines and carries out ... policy decisions"— became *involvement* in *major* policy decisions. The situation here must be viewed in light of *LaStar Cellular Tel. Co.*, 5 FCC Rcd 3286 (1990), where the Commission stated that "[d]ecisions regarding litigation, and most especially the appointment, compensation, and termination of a General Manager" are indicia of control. *See id.* at 3289. Amcell has the right to make all those decisions. Amcell also dominates the advertising, personnel and accounting functions that are probative of control under Commission precedent. *See generally Peoria Community Broadcasters, Inc.*, 79 F.C.C.2d 311 (1980); *WWIZ, Inc.*, 36 F.C.C. 561 (1964), *aff'd sub nom Lorain Journal Co. v. FCC*, 351 F.2d 824 (D.C.Cir.1965). Again the Commission has failed to reconcile its approvals of Thompson's arrangement with Amcell and its disapproval of parallel arrangements in prior cases.

The fourth *Intermountain* factor looks to which party is in charge of employment, supervision and dismissal of personnel. Under the management agreement Thompson has no authority to hire, fire or supervise the personnel used by Amcell to operate the Atlantic City system. The Commission, however, reasoned that "Amcell itself is subject to dismissal for cause by [Ellis Thompson Corporation], which thus has the ultimate responsibility for personnel management." 7 FCC Rcd at 3932. Here again Thompson's limited legal right to nullify Amcell's personnel decisions does not constitute primary control over hiring and firing. The Commission must explicitly choose to pursue either a *de jure* or a *de facto* version of the fourth *Intermountain* factor, and must justify the choice.

The Commission's application of the *Intermountain* test in this case amounts to a determination that it is a meaningless recitation with which the Commission may find compliance or noncompliance by arbitrarily saying in one case that theoretical access to the facility is sufficient while in another that the purported licensee must have actual control of the facility; that in one case a theoretical, hazy, and intermittent right to participate in daily operations is sufficient, in another actual control is required; that in one case awareness of policy decisions is sufficient and in another determining and carrying out policy decisions including preparing and filing applications is required; and that in one case being in actual charge of employment supervision and dismissal of personnel is a determinative factor and in another a factor hardly relevant to the *Intermountain* analysis at all. This is not reasoned decision-making, but the very sort of arbitrariness and capriciousness we are empowered to correct. Correct it we shall in this case. We therefore remand the Atlantic City order so that the Commission may bring its decision into compliance with agency precedent or explain its departure.

As we hold that the Atlantic City order effected an unexplained departure from Commission precedent under § 310(d), we will not proceed to review the other determinations made in the order. The intertwined character of the order's component parts gives rise to a substantial doubt that a partial affirmance would comport with the Commission's intent, *see North Carolina v. FERC*, 730 F.2d 790, 796 (D.C.Cir.1984), so that *vacatur* of the whole order would be proper however we judged the validity of the other determinations.

## CONCLUSION

For the reasons set forth above, we conclude that TDS lacks standing to appeal the Philadelphia order. We therefore dismiss that portion of the TDS appeal. However, as to the Atlantic City order, we hold that TDS has standing to appeal and that its appeal is well taken. We therefore order the Atlantic City order vacated and the case remanded for further proceedings.

*Affirmed in part and reversed and remanded in part.*