11-196-cr
United States v. Turner

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2011

(Argued: May 15, 2012 Decided: June 21, 2013)

No. 11-196-cr

_____

UNITED STATES OF AMERICA,
*Appellee,*

-v.-

HAROLD TURNER,
*Defendant-Appellant.*

_____

Before: POOLER and LIVINGSTON, *Circuit Judges*, and COGAN, *District Judge\**.

Defendant-Appellant Harold Turner appeals from his conviction by a jury in the United States District Court for the Eastern District of New York (Donald E. Walter, *J.*) of threatening a federal judge in violation of 18 U.S.C. § 115(a)(1)(B). On appeal, Turner argues (1) that the evidence at trial was insufficient to prove that Turner committed a "true threat"; (2) that the district court erred by failing to instruct the jury using language from *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976), regarding "true threats"; (3) that the prosecution engaged in impermissible and prejudicial conduct; and (4) that the district court abused its discretion in various evidentiary rulings. Turner, proceeding *pro se*, raises various additional arguments. We disagree with each of these contentions and therefore **AFFIRM**.

Judge Pooler dissents in a separate opinion.

_____

\* Judge Brian M. Cogan, of the United States District Court for the Eastern District of New York, sitting by designation.

RICHARD H. DOLAN (Ronald G. Russo, David Wikstrom, Harvey M. Stone, Elizabeth Wolstein & David J. Katz, *on the briefs*), Schlam Stone & Dolan LLP, New York, New York, *for Defendant-Appellant.*

WILLIAM R. RIDGWAY, Assistant United States Attorney (Manish S. Shah, Assistant United States Attorney, *on the brief*), *for* Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, Chicago, Illinois, *for Appellee.*

LIVINGSTON, *Circuit Judge*:

On June 2, 2009, Harold Turner published a blog post declaring that three Seventh Circuit judges deserved to die for their recent decision that the Second Amendment did not apply to the states:

> If they are allowed to get away with this by surviving, other Judges will act the same way.
> These Judges deserve to be made such an example of as to send a message to the entire judiciary: Obey the Constitution or die.

Turner's lengthy commentary declared that the blood of these three judges would "replenish the tree of liberty," that the judges "didn't get the hint" sent by a gunman who had murdered the family of another federal judge in Chicago, that they had not "faced REAL free men willing to walk up to them and kill them for their defiance and disobedience," that their ruling was "so sleazy and cunning as to deserve the ultimate response," and that the judges "deserve to be killed." The next morning Turner posted photographs, work addresses, and room

numbers for each of the three judges, along with a map indicating the location of the courthouse in which they worked, and a photograph of the building modified to point out "Anti-truck bomb barriers."

A jury convicted Turner of threatening to assault or murder Judges Frank Easterbrook, William Bauer, and Richard Posner with the intent to impede, intimidate, or interfere with them in the performance of their duties or to retaliate against them on account of their performance of official duties. This appeal presents several issues for our review, including whether the jury's verdict was supported by sufficient evidence of a true threat of violence. We hold that the evidence was sufficient, that the jury was properly instructed regarding a "true threat," and that Turner was not prejudiced by any error. We affirm.

**BACKGROUND**

*I. Facts*

Because Turner was convicted after trial, we recite the facts taking the evidence in the light most favorable to the verdict. *E.g.*, *United States v. Gowing*, 683 F.3d 406, 408 (2d Cir. 2012) (per curiam).

*A. Turner's Background*

Beginning in 2000, Harold Turner began operating a website located at halturnershow.com and purchasing weekly time on a shortwave radio station, both of which he used to broadcast what he described as a "talk radio show"—the

3

"Hal Turner Show." By 2003, Turner's opinions on race and politics had made his show popular with violent white supremacist groups such as the Ku Klux Klan and Aryan Nations, and Turner was receiving invitations to speak at national rallies, such as that of the Aryan World Congress in Coeur d'Alene, Idaho. As a result, the Federal Bureau of Investigation ("FBI") contacted Turner to find out whether he would be willing to report any violent acts he learned were about to occur. Turner agreed.

Between 2003 and 2007, Turner provided the FBI with some helpful information, reporting, for instance, on extremists who visited his website and proposed acts of violence. Turner ignored repeated admonishments regarding his own violent Internet speech, however, and the FBI terminated the relationship in 2007 for what Turner's FBI handler characterized at trial as "serious control issues."

*B.     Turner's Statements About Judges Easterbrook, Bauer, and Posner*

Two years later, on June 2, 2009—the same day the Seventh Circuit Court of Appeals handed down *National Rifle Association of America v. Chicago*, 567 F.3d 856 (7th Cir. 2009), *rev'd sub nom. McDonald v. Chicago*, 130 S. Ct. 3020 (2010)—Turner published a blog post on his publicly available website entitled, "OUTRAGE: Chicago Gun Ban UPHELD; Court says 'Heller' ruling by Supreme Court not applicable to states or municipalities!" Turner's post expressed fury

4

that "American gun owners have been put in spectacular jeopardy by a federal court ruling that enables states or cities to ban all—ALL—firearms ownership!" Turner then wrote that the three Seventh Circuit judges who decided the case should be killed:

> All the years of peaceful legal challenges; all the years of peaceful appeals; all the years of peacefully and lawfully lobbying federal and state legislators, to achieve the penultimate goal of finally interpreting the meaning of the Second Amendment, only to have it all thrown in the trash by three Appellate Judges in a manner so sleazy and cunning as to deserve the ultimate response.
> . . .
> The government—and especially these three Judges—are cunning, ruthless, untrustworthy, disloyal, unpatriotic, deceitful scum. Their entire reason for existing is to accrue unto themselves, power over everything.
> The only thing that has ever stood in the way of their achieving ultimate power is the fact that We The People have guns. Now, that is very much in jeopardy.
> Government lies, cheats, manipulates, twists and outright disobeys the supreme law and founding documents of this land because they have not, in our lifetime, faced REAL free men willing to walk up to them and kill them for their defiance and disobedience.
> Thomas Jefferson, one of our Founding Fathers, told us "The tree of liberty must be replenished from time to time with the blood of tyrants and patriots." It is time to replenish the tree!
> Let me be the first to say this plainly: These Judges deserve to be killed. Their blood will replenish the tree of liberty. A small price to pay to assure freedom for millions.

Turner then referred to the infamous murders of United States District Court Judge Joan Lefkow's husband and mother in Judge Lefkow's Chicago home on February 28, 2005, which he connected to Judge Lefkow's role in a court

5

case involving a white supremacist organization, the "World Church of the Creator," and its leader, Matthew Hale:

> This is not the first politically-motivated trash to come out of the Seventh U.S. Circuit Court of Appeals. In fact, it was the Seventh U.S. Circuit Court of Appeals that decided in the Matt Hale Case, that a group which fraudulently trademarked the name "World Church of the Creator" despite the fact they knew that name had been used by a Church for 30 years, could KEEP the name because the church who had used it for 30 years didn't challenge the Trademark filing!
>
> By not challenging the Trademark registration, the people who had used the name for years LOST IT.
>
> That decision lead [*sic*] to an order by a lower court for the Church to "surrender its Bibles for destruction because they infringed on the trademark" given to the fraudsters.
>
> Shortly thereafter, a gunman entered the home of that lower court Judge and slaughtered the Judge's mother and husband. Apparently, the 7th U.S. Circuit court didn't get the hint after those killings. It appears another lesson is needed.
>
> These Judges are traitors to the United States of America. They have intentionally violated the Constitution. They have now also intentionally ignored a major ruling by the US Supreme Court.
>
> If they are allowed to get away with this by surviving, other Judges will act the same way.
>
> These Judges deserve to made such an example of as to send a message to the entire judiciary: Obey the Constitution or die.

The next day, Turner posted an "update" stating: "Judges official public work addresses and a map of the area are below. Their home addresses and maps will follow soon. Behold these devils . . . ." What followed were the names and photographs of United States Circuit Judges Frank Easterbrook, William Bauer, and Richard Posner; the room numbers for each of the judges' chambers

within the Everett McKinley Dirksen United States Courthouse; and a photograph and map of the courthouse's location in Chicago. On the building's photograph Turner drew red arrows and wrote, "Anti-truck bomb barriers," to illustrate the location of these barriers around the building.[1]

The day Turner published this post, Judge Posner received an email from an organization called Citizens Against Hate that contained a link to Turner's website and suggested that Judge Posner might want to take a look at it. Judge Posner, concerned for his safety, notified the United States Marshals Service of Turner's statements. At the same time, one of Judge Bauer's clerks discovered the blog post and informed Judge Bauer. Chief Judge Easterbrook learned of Turner's post shortly thereafter, when Judge Bauer strode into Judge Easterbrook's chambers to show him. His immediate reaction "was that somebody was threatening to kill me." Not only were all three judges acutely aware of the murder of Judge Lefkow's mother and husband (they all knew Judge Lefkow personally), the judges also knew that the individual mentioned by Turner—Matthew Hale—had been convicted of soliciting the murder of Judge Lefkow. *See generally United States v. Hale*, 448 F.3d 971 (7th Cir. 2006) (per curiam).

---

[1] Turner promised in this posting that home addresses and maps would follow. FBI agents later recovered a document from Turner's computer that consolidated residential addresses for the three judges, but Turner did not actually post the addresses before his arrest on June 25, 2009.

*C.*     *The Context of Turner's Statements*

None of the three judges had ever heard of Turner before reading his blog post. Other posts readily accessible on the blog, however, provided context from which a reader might infer Turner's intentions in writing the post. Immediately preceding Turner's post about Judges Easterbrook, Bauer, and Posner, for example, was another post, also published on June 2, which accused a Connecticut legislator and the Connecticut Office of State Ethics (OSE) of tyranny and declared: "It is our intent to foment direct action against these individuals personally.[2] These beastly government officials should be made an example of as a warning to others in government: Obey the Constitution or die." Turner continued, "If any state attorney, police department or court thinks they're going to get uppity with us about this; I suspect we have enough bullets to put them down too." Further, Turner's post announced that later that week he would "releas[e] the home addresses of the Senator and Assemblyman who introduced Bill 1098 as well as the home address of Thomas K. Jones from the OSE." In Turner's words, "[I]f they are so proud of what they're doing, they shouldn;t [*sic*] mind if everyone knows where they live." A timestamped update that was added the afternoon of June 2 stated simply: "Officer Boyle of the

---

[2] Turner admitted at trial that when he wrote "our intent," he meant his own intent.

8

Connecticut State Capitol Police just called regarding this story. Seems they are concerned about the 'Commentary' below. Looks the tyrants are worried [*sic*]. Good."

Turner's website also declared that he was "going after" "every major player in the financial meltdown." "I intend to incite revenge," Turner wrote. "Vicious, brutal, savage, revenge with malice aforethought." Turner explained why his blog posts should be taken seriously by his targets:

> While I can't legally undertake killing, I may—just MAY—be able to say enough of the right things, to enough of the right people, to make it happen: People who have lost everything on account of you. People whose children have lost everything on account of you. People with nothing to lose by hunting you down and murdering you. I am going to be pounding them with information about you day and night. On and on, week after week after week. Sooner or later, some of them are gonna snap and you will get dead.
> While I certainly would never use this blog for such an endeavor, my eight years on the radio and on the internet has gotten me in touch with enough of the right people to get it done. I know how to get it done. Federal District Judge Joan Humphrey Lefkow in Chicago is proof.
> Judge Lefkow made a ruling in court that I opined made her "worthy of death." After I said that, someone went out and murdered her husband and mother inside the Judges Chicago house.
> You new world order types . . . . . . I'll be talking about YOU next.
> Think this is terrorism? You ain't seen terrorism yet. But I think it's coming.

Two emails sent by Turner and introduced at trial shed further light on Turner's purpose in posting the names, photographs, and work addresses of

Judges Easterbrook, Bauer, and Posner.  Both emails were sent in late April 2009, approximately five weeks before Turner published the statements at the center of this case.  The first email, which Turner sent to a Utah state court official after a judge's ruling angered him, stated, "[M]aybe I ought to abuse *my* power and give out [the judge's] home address.[] Having done such things in the past, I know this is an effective way to cause otherwise immune public servants to seriously rethink how they use the power lent to them by We The People."  In the second email, sent to an individual working at the *New York Times*, Turner wrote:

> The perpetrator of [certain] murders was later killed in a confrontation with police.  So there was no way to ever prove whether he was motivated by my remarks.  Hence, I could not be prosecuted.
> That incident taught me how my position on radio could be utilized.  Today, I use that power to confront what I see as injustice.  Of late, I have been naming the key players in the financial meltdown as people "worthy of being dealt with."  Sooner or later, perhaps some distraught person who lost everything to the shyster bankers, may decide to go after them.
> If that happens. . . . .I won't shed a tear.

## II.  Procedural History

Turner was indicted on July 22, 2009, for "threaten[ing] to assault and murder three United States judges with the intent to impede, intimidate, and interfere with such judges while engaged in the performance of official duties

and with intent to retaliate against such judges on account of the performance of official duties," in violation of 18 U.S.C. § 115(a)(1)(B).[3]

Because the three victims were Seventh Circuit judges, the case was not assigned to a district judge in the Seventh Circuit, but rather was assigned to Judge Donald E. Walter, United States District Judge of the Western District of Louisiana, who was sitting by designation in the Northern District of Illinois. On September 17, 2009, upon Turner's motion, Judge Walter ordered the case transferred to the Eastern District of New York.

After two mistrials, trial was held in August 2010. The government presented testimony from several FBI agents, an inspector with the United States Marshals Service, and Judges Easterbrook, Bauer, and Posner. Turner served as his own principal witness. Turner admitted that he wrote the blog posts in question, but contended that his statements were mere political hyperbole and did not amount to a threat of violence. Turner also argued that the FBI had advised him, before their relationship was terminated in 2007, that statements like his blog posts of June 2 and 3, 2009, were constitutionally

---

[3] 18 U.S.C. § 115(a)(1)(B) provides in relevant part:
Whoever . . . threatens to assault, kidnap, or murder . . . a United States judge . . . with intent to impede, intimidate, or interfere with such . . . judge . . . while engaged in the performance of official duties, or with intent to retaliate against such . . . judge . . . on account of the performance of official duties, shall be punished . . . .

11

protected speech. The relevant FBI agents testified in rebuttal that they never opined on the legality of Turner's conduct and never authorized him to threaten public officials.

At the close of the evidence, Turner moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied.

The district court instructed the jury with respect to the elements of the offense, including (1) that "a statement is a threat if it was made under such circumstances that a reasonable person hearing or reading the statement and familiar with its context would understand it as a serious expression of an intent to inflict injury;" and (2) that they could convict only if they found beyond a reasonable doubt that Turner "acted with the intent to impede, intimidate, or interfere with the United States judges while engaged in the performance of their official duties, or with the intent to retaliate against the United States judges on account of the performance of their official duties." After delivering these instructions, the district court explained to the jury:

> The First Amendment protects vehement, scathing, and offensive criticism of public officials, including United States judges. Should you find that the defendant's statements for which he is charged were no more than mere political hyperbole then you may be justified in finding that no threat was in fact made. I instruct you, however, that a threat as I have defined the term in these instructions is not protected by the First Amendment of the United States Constitution.

After about two hours of deliberation, the jury returned a unanimous verdict of guilty.

On January 18, 2011, Turner filed this appeal.

## DISCUSSION

On appeal, Turner argues that the trial evidence was insufficient to prove that he threatened Judges Easterbrook, Bauer, and Posner within the meaning of § 115(a)(1)(B), as opposed to engaging in First Amendment-protected speech. He also claims that the district court failed to instruct the jury properly with respect to the First Amendment. Finally, he maintains that various improper government statements and evidentiary rulings prejudiced the trial. We address each of these contentions in turn.

### I. Sufficiency of the Evidence

Turner argues principally that the evidence at trial was insufficient to prove that he threatened Judges Easterbrook, Bauer, and Posner, and that, because his blog posting "could only reasonably be read[] as political opinion" and not a true threat of violence, it was protected by the First Amendment. We disagree.

In reviewing a conviction for sufficiency of the evidence, we "view the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's favor." *United States v. Sabhani*, 599 F.3d 215,

13

241 (2d Cir. 2010). "In general, 'whether a given writing constitutes a threat is an issue of fact for the trial jury,'" *United States v. Davila*, 461 F.3d 298, 304 (2d Cir. 2006) (quoting *United States v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994)) (brackets omitted); *see also United States v. Carrier*, 672 F.2d 300, 306 (2d Cir. 1982) ("Most cases [involving alleged threats] are within a broad expanse of varying fact patterns which may not be resolved as a matter of law, but should be left to a jury."), and we therefore affirm the conviction if "the evidence at trial was . . . sufficient to permit a reasonable jury to find that [Turner's] conduct constituted a threat." *Davila*, 461 F.3d at 305.

Turner does not challenge the application of this standard of review to his case, but reaffirms it. We note, however, that in matters implicating the First Amendment, we in some contexts independently review so-called "constitutional facts," "scrutiniz[ing] carefully the lower court's application of the relevant standards to the facts at hand" to ensure that a judgment does not intrude on First Amendment rights. *United States v. Cutler*, 58 F.3d 825, 833-34 (2d Cir. 1995) (emphasis omitted). The Ninth Circuit has invoked the constitutional facts doctrine in the context of a threats conviction, suggesting that an appellate court "[d]efer[s] to the jury's findings on historical facts, credibility determinations, and elements of statutory liability," but then "conduct[s] an independent review of the record to determine whether the facts as found by the

14

jury establish the core constitutional fact" of a true threat. *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002). Other courts, however, have conducted sufficiency review in this context without reference to the constitutional facts doctrine. *See, e.g., United States v. Jeffries*, 692 F.3d 473, 481 (6th Cir. 2012) (reviewing a threats conviction for sufficiency without reference to the constitutional facts doctrine); *United States v. Parr*, 545 F.3d 491, 496-97 (7th Cir. 2007) (same). Moreover, at least one noted commentator has taken the view that "federal appellate courts have authority to exercise independent judgment with respect to adjudicative facts decisive of constitutional law application," but that "it goes too far to convert this competence into a duty," even in the First Amendment context. Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229, 276 (1985); *see also* Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, *Hart & Wechsler's The Federal Courts & The Federal System* 334-35 (6th ed. 2009) (noting that "[t]oday, the vitality of the constitutional . . . fact doctrine[] is disputed . . . .").

We need not decide in this case whether we are *required* to conduct an independent review of the record as to the core constitutional question of the existence of a true threat. Here, the result is the same whether the constitutional fact doctrine is (or is not) implicated. We determine that the

evidence at trial was more than sufficient to permit a reasonable jury to find each of the elements of § 115(a)(1)(B)—including the requirement of a true threat—beyond a reasonable doubt. We also conclude based on an independent review of the record that the core constitutional fact of a true threat was amply established, and that Turner's conduct was unprotected by the First Amendment.

* * *

The statute of Turner's conviction, 18 U.S.C. § 115(a)(1)(B), includes both objective and subjective elements: to be convicted, Turner must have both (1) "threaten[ed] to assault . . . or murder" a federal judge, and (2) "inten[ded] to impede, intimidate, or interfere with such . . . judge . . . while engaged in the performance of official duties, or . . . inten[ded] to retaliate against such . . . judge . . . on account of the performance of official duties." *Id.* Turner does not contest that the evidence at trial was sufficient to prove that he intended to intimidate or retaliate against Judges Easterbrook, Bauer, and Posner. Rather, he argues that the evidence failed to prove a true threat.

This Circuit's test for whether conduct amounts to a true threat "is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *Davila*, 461 F.3d at 305 (quoting *Malik*, 16 F.3d at 49) (internal

16

quotation mark omitted).[4] Prohibitions on true threats—even where the speaker has no intention of carrying them out—"'protect[] individuals from the fear of violence' and 'from the disruption that fear engenders[]' . . . ." *Virginia v. Black*, 538 U.S. 343, 360 (2003) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)), and are fully consistent with the First Amendment. *See id.* at 359*; see also* Kent Greenawalt, *Speech, Crime, and the Uses of Language* 91 (1989) ("Despite the relevance of freedom of speech, a legislature could reasonably decide to make it criminal for a person with apparent firmness of purpose to threaten a specific legal wrong grave enough to be likely either to cause substantial emotional disturbance in the person threatened or to require the employment of substantial resources for investigation or prevention.").

---

[4] This Court's decision in *Davila* post-dates, but did not address, *Virginia v. Black*, 538 U.S. 343 (2003), in which the Supreme Court stated that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359. Since *Black*, some disagreement has arisen among our sister circuits regarding whether *Black* altered or overruled the traditional objective test for true threats by requiring that the speaker subjectively intend to intimidate the recipient of the threat. *Compare United States v. Cassel*, 408 F.3d 622, 632-33 (9th Cir. 2005) (interpreting *Black* as holding that "intent to intimidate is necessary" for speech to qualify as a true threat) *with Jeffries*, 692 F.3d at 479-80 (declining to require specific intent in the definition of a true threat) *and United States v. White*, 670 F.3d 498, 508-09 (4th Cir. 2012) (same). Turner makes no argument based on this division and this case poses no occasion to address it. Even assuming, *arguendo*, that *Black* did alter the definition of "true threats" to require subjective intent to intimidate, the outcome in this case would be the same: the statute under which Turner was convicted includes a subjective intent element, *see* 18 U.S.C. § 115(a)(1)(B), and based on our independent review of the record we conclude that a true threat was established pursuant to both the objective and subjective tests.

Turner first argues that he engaged in constitutionally protected pure political speech: an expression of his editorial opinion about the Seventh Circuit's decision with respect to the Second Amendment. We have no doubt that Turner was constitutionally entitled to condemn and disparage the Seventh Circuit. "[D]ebate on public issues should be uninhibited, robust, and wide open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)) (internal quotation mark omitted). But Turner's political criticism was not the basis for his conviction. Rather, he was convicted of doing something more—of threatening the lives of three judges with the intent, as § 115(a)(1)(B) provides, "to impede, intimidate, or interfere with such . . . judge[s] . . . while engaged in the performance of official duties." 18 U.S.C. § 115(a)(1)(B). As already stated, prohibiting threats—both to preserve citizens from fear and "from the possibility that the threatened violence will occur," *Black*, 538 U.S. at 359–60 (internal quotation marks omitted)—is constitutionally permissible. The evidence was more than sufficient, moreover, for a jury to conclude that Turner's statements were not "political hyperbole," as he contended, but violent threats against the judges' lives.

Turner contends that no reasonable person could have interpreted his statements as a threat because "[Turner's] kind of talk permeates public discourse." Appellant's Br. at 41. He cites examples, including a former congressman who was quoted in a local newspaper as saying of a gubernatorial candidate, "Instead of running for governor of Florida, they ought to have him and shoot him. Put him against the wall and shoot him." *See* Christopher J. Kelly, *Kanjorski Ponders 'Nuts,' Bolts from Blue*, The Times-Tribune (Scranton) (Oct. 23, 2010) http://thetimes-tribune.com/opinion/editorials-columns/roderick-random/kanjorski-ponders-nuts-bolts-from-blue-1.1052739. Although we lack the necessary context to evaluate many of the proffered statements, none of the brief or off-the-cuff remarks cited by Turner rises nearly to the seriousness of Turner's extended discussion of killing Judges Easterbrook, Bauer, and Posner.[5] And if Turner were able to furnish examples of other threats as apparently serious as his attack on these judges, those threats would also exceed the ambit of the First Amendment's protections—not exonerate Turner.

---

[5] The examples Turner provides in his brief seem more akin to the facts in *Watts*, 394 U.S. 705, in which the Supreme Court reversed the conviction of an eighteen-year-old who, while participating in a discussion group during a public rally at the Washington Monument, stated he had recently received his draft classification but "[i]f they ever make me carry a rifle, the first man I want to get in my sights is L.B.J."—at which point the crowd laughed. *Id.* at 706; *see id.* at 707. The Court held that these facts were insufficient to prove a true threat to harm the President. *See id.* at 708. But such an obviously flippant statement is quite different from Turner's lengthy and detailed discussion of killing the three judges.

The full context of Turner's remarks reveals a gravity readily distinguishable from mere hyperbole or common public discourse. In his blog post, Turner not only wrote that these three judges should be killed, but also explained how Judge Lefkow had ruled against Matt Hale and how, "[s]hortly thereafter, a gunman entered the home of that lower court Judge and slaughtered the Judge's mother and husband. Apparently, the 7th U.S. Circuit court didn't get the hint after those killings. It appears another lesson is needed." Judges Easterbrook, Bauer, and Posner were of course familiar with those murders, with Judge Lefkow, and with Matt Hale's subsequent prosecution for soliciting someone to kill Judge Lefkow. Such serious references to actual acts of violence carried out in apparent retribution for a judge's decision would clearly allow a reasonable juror to conclude that Turner's statements were a true threat. *See Davila*, 461 F.3d at 305 (holding that the evidence was sufficient to support a threat conviction where the threatening letter was sent "not long after the well-publicized anthrax attacks of 2001" and was "accompanied by apparent references to anthrax and Osama Bin Laden"). Indeed, the Fourth Circuit recently affirmed a threat conviction in very similar circumstances—where a speaker "conclud[ed] [his] email by comparing [the recipient] to Judge Lefkow, whose relatives had been murdered." *United States v. White*, 670 F.3d 498, 512 (4th Cir. 2012). The Fourth Circuit determined that

20

given this reference, among other things, "[a]ny reasonable recipient of this email would have taken it as a threat of violence." *Id.*

The evidence of a threat in this case is even stronger. Turner posted on his website that "Judge Lefkow made a ruling in court that I opined made her 'worthy of death[,]' [and] [a]fter I said that, someone went out and murdered her husband and mother inside the Judges Chicago house." Given that Turner's statements publicly implied a causal connection between Turner's calls for judges' deaths and actual murders, his statements about Judges Easterbrook, Bauer, and Posner, were quite reasonably interpreted by the jury as the serious expression of intent that these judges, too, come to harm. *See Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1079 (9th Cir. 2002) (en banc) (finding that a "WANTED" poster naming a specific victim constituted a true threat after three individuals who had previously been featured in such "WANTED" posters had been murdered). The seriousness of the threat, moreover, was further shown by Turner's posting of the judges' photographs and work addresses. Coupled with Turner's admission in an email a few weeks earlier that releasing addresses was an "effective way to cause otherwise immune public servants to seriously rethink how they use [their] power," the jury had abundant evidence from which to conclude that Turner was threatening the judges in retaliation for their ruling, rather than engaging in mere political hyperbole.

21

Turner argues that a "close syntactical analysis" of his statements reveals that he used only the passive voice. He wrote variously that Judges Easterbrook, Bauer, and Posner "deserve to be killed"; that "[i]f they are allowed to get away with this by surviving, other Judges will act the same way"; and that "[t]hese Judges deserve to be made such an example of as to send a message to the entire judiciary: Obey the Constitution or die." Because he never explicitly wrote, "I will kill them," Turner claims, his words cannot reasonably have been interpreted as a threat. The dissent essentially concurs in this argument, contending that at least when an alleged threat constitutes a "public statement of advocacy" as opposed to a "personal communication[]," it "must be clearly in the form of a threat" to constitute a true threat for First Amendment purposes. [slip op. __ (dissent at 8)].

With respect, this comports neither with precedent nor with the protections afforded by the First Amendment. As we have said before, "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render the statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." *Malik*, 16 F.3d at 50; *see also United States v. Shoulberg*, 895 F.2d 882, 886 (2d Cir. 1990) (upholding a threat conviction against a First

22

Amendment challenge due to an "*implied . . .* use [of] violence" and "*overtones* of imminent threat" (emphases added)). *Malik*, moreover, is in full accord with the Supreme Court's recognition in *Virginia v. Black*, 538 U.S. 343 (2003), that given the surrounding context, cross burnings may constitute unprotected threats of violence, *see id.* at 354, 357, 363, despite the wholly *implicit* nature of the serious threat they convey.

Here, Turner did not merely advocate law violation or express an abstract desire for the deaths of Judges Easterbrook, Bauer, and Posner. He posted photographs, work addresses and room numbers for each of the judges, along with a map and photograph of the courthouse. Moreover, Turner's intent to interfere with these judges—to intimidate them through threat of violence— could not have been more clearly stated in his pointed reference to their colleague, whose family members had been killed: "[A] gunman entered the home of that lower court Judge and slaughtered the Judge's mother and husband. Apparently, the 7[th] U.S. Circuit court didn't get the hint . . . ." The dissent, acknowledging that Turner wished to see the three judges dead, nevertheless concludes that Turner's statements cannot constitute a true threat because publicly made, although his speech "might be subject to a different interpretation if, for example, the statements were sent to the Judges in a letter or email." [slip op. __ (dissent at 8)]. It is hard to see how Turner's threat

became less threatening, however, because publicly issued—particularly given Turner's own boasting that public dissemination of address information is "an effective way" to instill fear, "to cause otherwise immune public servants to seriously rethink how they use the power lent to them by We The People."

We do not hold and do not mean to suggest that syntax is not a relevant factor for consideration in appropriate cases.[6] But Turner's jury clearly acted reasonably in concluding that Turner's statements amounted to a true threat given, *inter alia,* his lengthy discussion of killing the three judges, his reference to the killing of Judge Lefkow's family, and his update the next day with detailed information regarding how to locate Judges Easterbrook, Bauer, and Posner. All this is powerful evidence of a true threat—that Turner intended his website to intimidate Judges Easterbrook, Bauer, and Posner and to impede them in the performance of their duties by putting them in fear for their lives.

Turner claims, next, that *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976), defines threats very narrowly, and that it requires reversal here. The

---

[6] For example, in *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011), on which Turner relies heavily, the Ninth Circuit vacated a threats conviction, basing its decision in part on the fact that the speaker did not use the first person in writing that the President "will have a 50 cal in the head soon" and "shoot the nig." *Id.* at 1119. But the facts in *Bagdasarian* were not nearly as seriously threatening as Turner's extended discussion of killing Judges Easterbrook, Bauer, and Posner: the *Bagdasarian* defendant simply posted on a Yahoo! Finance online message board two one-sentence comments containing the quoted language—while simultaneously posting other comments suggesting that he was drunk. *See id.* at 1115 & n.10.

24

*Kelner* Court concluded that "a narrow construction of the word 'threat'" in 18 U.S.C. § 875, which criminalizes the transmission in interstate commerce of a communication containing a threat to injure the person of another, is fully consistent with the First Amendment, despite the absence in § 875 of any requirement that the defendant specifically intend to carry out the threat. *Id.* at 1027. Affirming the threat conviction there, the court wrote in dicta that "[s]o long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, [18 U.S.C. § 875] may properly be applied." *Id.* at 1027. *But see id.* at 1029 (Mulligan, *J.*, concurring) ("I cannot accept Judge Oakes's obiter dicta . . . . [T]he proposed requirement that the threat be of immediate, imminent and unconditional injury seems to me to be required neither by the statute nor the First Amendment."). Turner argues, in effect, that *Kelner* requires that *all* threats, whatever the statute prohibiting them, must satisfy these conditions before they may be punished consistent with the First Amendment.

Suffice it to say that this does not describe our cases, which have affirmed convictions for threats that were both conditional and inexplicit. In *Malik*, 16 F.3d 45, for example, we affirmed a threat conviction pursuant to 18 U.S.C. § 876, which prohibits mailing threatening communication, based on "cryptic and

menacing" letters (containing phrases such as "Ii'll play likewise with you judges from a Koranic and Torooh perspective thats an eye for an eye and life for a life"). *Id.* at 50. We acknowledged that the letters were "[a]rguably . . . ambiguous." *Id.* But we wrote, directly contrary to Turner's argument, that "[a]n absence of explicitly threatening language does not preclude the finding of a threat . . . and, of course, a conditional threat—*e.g.*, 'your money or your life'—is nonetheless a threat." *Id.* at 49 (citations omitted); *see also Davila*, 461 F.3d at 304–05 (upholding a conviction for delivering a threat through the mail where the defendant delivered a substance that appeared to be anthrax powder). The "existence *vel non* of a 'true threat,'" we also said, "is a question generally best left to a jury." *Malik*, 16 F.3d at 51.

More importantly, moreover, Turner's interpretation of *Kelner*—that only communications that facially threaten unequivocal, unconditional, immediate, and specific injury may be prohibited consistent with the First Amendment—is contrary to the Supreme Court's conclusion in *Black*. The *Black* Court held that cross burning can constitute a threat, depending upon the surrounding circumstances, because "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." 538 U.S. at 360. But, as the Supreme Court acknowledged, "a

burning cross does not inevitably convey a message of intimidation," even though few, if any, messages are as ominous. *Id.* at 357. Turner suggests that it is necessary that his statements on their face show that he personally "intend[ed] to take violent action against the judges." But neither *Kelner*, nor certainly *Black*, impose this requirement. *See id.* at 359–60.

Turner argues, finally, that his language, on its face, purported to be directed at third parties, rather than the judges themselves, and that it therefore cannot be prohibited unless it constitutes incitement within the meaning of *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam).[7] The dissent appears to agree, concluding that Turner's speech, "as advocacy of the use of force, falls outside the true threats category," but perhaps may still be constitutionally proscribed. [slip op. __ (dissent at 9)]. This argument, however, again relies overmuch on the literal denotation and syntax of Turner's statements, refusing to acknowledge that threats—which may be prohibited, consistent with the First Amendment—need be neither explicit nor conveyed with the grammatical precision of an Oxford don. Turner's conduct was reasonably found by the jury to

---

[7] "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447.

27

constitute a threat, unprotected by the First Amendment; it need not also constitute incitement to imminent lawless action to be properly proscribed.[8]

Having considered and dismissed Turner's arguments with respect to the sufficiency of the evidence, we conclude that reasonable jurors could have found, based on the evidence at trial, that Turner's statements constituted a threat of serious harm to the three victim judges, and that Turner undertook this threat with the intent to intimidate them while they were engaged in the performance of their duties or to retaliate against them for said performance. Accordingly, the evidence was sufficient. Furthermore, based on an independent review of the record and for essentially the reasons stated above, we conclude that Turner's conduct constituted a true threat for First Amendment purposes.

## II. Jury Instructions

Turner next argues that the district court erred by failing to instruct the jury with language from *Kelner* and, further, that this error violated Turner's Sixth Amendment right to a jury trial on the essential elements of the offense. According to Turner, the district court was required to inform the jurors that

---

[8] Turner also argues that the indictment was constructively amended from a threats offense to an incitement offense or, alternatively, that there was a prejudicial variance between the indictment and the proof at trial. The indictment, however, charged Turner with threatening federal judges in violation of 18 U.S.C. § 115(a)(1)(B), and the jury was properly instructed regarding the elements of that statute—including the requirements of a true threat, *see* Part II, *infra*. The evidence at trial was more than sufficient to establish Turner's violation of § 115(a)(1)(B). Hence, Turner's claim is without merit.

they could convict him only if his statements were "so unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Appellant's Br. at 72 (quoting *Kelner*, 534 F.2d at 1027).

The government argues that Turner waived any such objection because, although Turner requested that the *Kelner* language be included in the jury instructions during his first trial, he never specifically objected when the court declined to use it, and because the proposed jury instructions Turner submitted during the second and third trials made no mention of this sentence from *Kelner*. Rule 30 of the Federal Rules of Criminal Procedure prohibits us from considering an objection that was not properly raised below unless it amounts to plain error. *See* Fed. R. Crim. P. 30(d). We conclude that we need not decide whether Turner properly objected, however, because the district court did not err in its instructions by omitting the *Kelner* dicta in any event.

We review claims of error in jury instructions *de novo*. *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Bahel*, 662 F.3d 610, 634 (2d Cir. 2011) (internal quotation marks omitted).

In this case, the district court instructed the jury:

> [W]hether a particular statement is a threat is governed by an objective standard. That is, a statement is a threat if it was made under such circumstances that a reasonable person hearing or reading the statement and familiar with its context would understand it as a serious expression of an intent to inflict an injury. An absence of explicitly threatening language does not preclude you from finding the statement to be a threat.
>
> It is not necessary for the government to prove that the defendant intended to carry out the threat, that the defendant had the ability to carry out the threat, or that the defendant communicated the threat to the victims. The relevant intent is the intent to communicate the threat.
>
> In determining whether the charged statements constitute a threat, you should consider the context in which they were made. Written words or phrases and their reasonable connotations take their character as threatening or harmless from the context in which they are used, measured by the common experience of the society in which they are published. This includes the circumstances in which they are uttered as well as the circumstances of the person who uttered them.
>
> . . .
>
> The First Amendment protects vehement, scathing, and offensive criticism of public officials, including United States judges. Should you find that the defendant's statements for which he is charged were no more than mere political hyperbole then you may be justified in finding that no threat was in fact made. I instruct you, however, that a threat as I have defined the term in these instructions is not protected by the First Amendment of the United States Constitution.

Although these instructions reflect the test we have outlined in prior cases, *see, e.g.*, *Davila*, 461 F.3d at 305, Turner contends that *Kelner* specified additional elements of a threat offense that are necessary for conviction: namely, that it be "so unequivocal, unconditional, immediate, and specific as to the

30

person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . ." *Kelner*, 534 F.2d at 1027. We have affirmed convictions in which the jury was instructed with such language, *see Malik*, 16 F.3d at 51, but we have never held that such an instruction is constitutionally required. Indeed, in *Kelner* itself—where we affirmed the conviction—the relevant portion of the jury instruction stated only that "[m]ere political hyperbole or expression of opinion or discussion does not constitute a threat," and that the jury would be justified in finding that no threat was in fact made if the statements were "no more than an indignant or extreme method of stating political opposition . . . ." *Kelner*, 534 F.2d at 1025 (internal quotation marks omitted) (alteration in original). The district court's instruction in this case contained nearly identical language. We therefore conclude that the district court did not err by omitting the requested *Kelner* language from its jury instructions.

Turner also argues that the district court plainly erred by charging the jurors only that they "may"—rather than "must"—acquit if they found Turner's statements to be mere political hyperbole. Turner does not contest that he failed to raise this objection below and that our review is therefore restricted to plain error. Accordingly, we may exercise our discretion to notice a forfeited error only where there was in fact error, it was plain, it affected Turner's substantial rights, and the error seriously affects the fairness, integrity, or public reputation

of judicial proceedings. *United States v. Cain*, 671 F.3d 271, 287 (2d Cir. 2012). "[T]he burden of establishing entitlement to relief for plain error is on the defendant claiming it . . . ." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004).

Even assuming *arguendo* that the district court erred by using the word "may" rather than "must" in this portion of its charge, this error was not plain. Turner cannot show that he was prejudiced by any error. The district court's other instructions properly defined the elements necessary for the jury to find a true threat. To convict, the jury therefore had to conclude that Turner's statements would reasonably be interpreted by someone hearing or reading them and familiar with their context as a serious expression of an intent to inflict injury, and that he intentionally made these statements to intimidate or retaliate against the judges. These findings are sufficient to satisfy the First Amendment.

We therefore conclude that the district court's jury instructions did not contain prejudicial error.

### III. Other Arguments

Both in his counseled and in a supplemental *pro se* brief, Turner raises various other arguments challenging his conviction. We conclude that none requires reversal.

*A.* *Evidence and Government Statements Regarding Turner's Audience*

Turner argues that the government impermissibly suggested to the jury, both in questioning witnesses and in its summation, that Turner was inciting a large audience of racist followers, which Turner contends is irrelevant to whether he made a true threat in violation of 18 U.S.C. § 115(a)(1)(B). Because Turner did not object at trial, we review for plain error. *See United States v. Williams*, 690 F.3d 70, 75(2d Cir. 2012); *United States v. Simels*, 654 F.3d 161, 168 (2d Cir. 2011).

We find no error, much less plain error. The degree to which Turner's statements were widely read and noted publicly was relevant to whether Turner intended for his threats to reach—and thus to intimidate—Judges Easterbrook, Bauer, and Posner. In April 2009 emails, Turner himself drew the link between his audience and his perceived ability to influence public officials: his "position on the radio" gave him the "power" to "confront what I see as injustice" and to "cause otherwise immune public servants to seriously rethink how they use the power lent to them by We The People."

Moreover, it was Turner himself, not the government, who emphasized his status in the white supremacist community, thereby placing the nature of his

33

audience at issue.[9]  *See United States v. Miller*, 478 F.2d 1315, 1318 (2d Cir. 1973) (holding that government's questions on cross-examination and remarks during summation regarding defendant's association with a team of robbers did not create unfair prejudice because defendant had "placed in issue the scope of his association" with the robbers during direct examination).  In the course of mounting a defense based in part on the claim that FBI agents had previously advised him that blog postings of the sort he posted on June 2 and 3, 2009 were constitutionally protected, Turner testified during direct examination that "my show was . . . popular with groups that had a history of doing terrible violence . . . [such as t]he K[]u Klux Klan, Aryan Nations, [and] Nazis."  And Turner claimed that the FBI viewed him "as a celebrity or—I don't want to say a star because I'm not a star, but . . . I had a celebrity kind of status" among white supremacist groups.  Indeed, the FBI's recruitment of Turner owing to his association with radical groups was the "center" of his defense, according to Turner's counsel, and was referenced both in testimony and in exhibits—specifically, FBI documents mentioning Turner's ties to white supremacists—that were part of the defense case.  Since Turner himself first drew attention to these associations, he can hardly accuse the government of

---

[9] The district court ordered that the government could not reference Turner's membership in a racist organization "*unless* the defendant open[ed] the door."  Turner undeniably "opened the door" to the line of inquiry to which he now, belatedly, objects.

34

prejudicing the jury by later addressing them. Accordingly, we find no impropriety in the government's statements and its use of evidence regarding Turner's audience.

*B.* *Government Statements Regarding the First Amendment*

Turner next takes issue with certain remarks made by the prosecution with respect to the First Amendment. In its summation, the government told the jury:

> Now, I expect the judge will instruct you here—one moment on the First Amendment, actually. You've heard about the First Amendment in this case, that somehow this is protected speech. You'll notice from the instruction that it's actually not the case. You can't threaten violence against people.
> In this country, you can criticize people, you can use hate speech, love speech, or anything in-between. But the minute you say ["]do what I think or you're gonna die,["] that's not protected speech. And that's what the judge will instruct you, that threats, as defined by these instructions, [are] not protected by the First Amendment. You don't have to let that be part of your analysis at all.

The government also said that "[v]ictims don't care about punctuation and verb tense," and that "how an average person would understand [these words] if they were the subject of that which was written" was "the only thing that matters."

Turner argues that these statements were "completely wrong." He did not object at trial, however, so our review is restricted to plain error. *See Williams*, 690 F.3d at 75. We find none here. Even assuming *arguendo* that the

government's comments did not perfectly state the elements of § 115(a)(1)(B) and the relevant First Amendment principles, these remarks did not "cause[] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005). Moreover, the district court properly instructed the jury immediately following the summations and explicitly stated, "You must accept the law as I provide it in these instructions." We therefore cannot find plain error in the government's statements regarding the First Amendment.

C.   *Testimony of Judges Easterbrook, Bauer, and Posner*

Turner next argues that the district court erred in denying his motion *in limine* to preclude Judges Easterbrook, Bauer, and Posner from testifying because such testimony would be irrelevant and substantially more prejudicial than probative. This argument, however, is directly foreclosed by our precedent. *See Malik*, 16 F.3d at 49 (affirming a conviction for threatening a judge, and holding that the judge's testimony regarding his interpretation of the defendant's statements was "highly relevant"); *see also Davila*, 461 F.3d at 305 ("[P]roof of the effect of the alleged threat upon the addressee is highly relevant." (internal quotation marks omitted)).

Turner also argues that Chief Judge Easterbrook's comment that "there have been many federal judges assassinated in the past 50 years" lacked any

factual basis. Suffice it to say, again, that Turner did not object, and Chief Judge Easterbrook's fleeting comment could hardly have prejudiced Turner so as to satisfy the plain error standard. *See United States v. Zangari*, 677 F.3d 86, 96 (2d Cir. 2012).

D.    *Evidence that the Threats Were Not Carried Out*

Finally, Turner argues that the district court improperly sustained the government's relevance objections when he attempted to ask Chief Judge Easterbrook whether "anything ever happen[ed] . . . as a result of the blog posting." We conclude, however, that the district court did not abuse its discretion in sustaining the government's objection. Turner was permitted to ask more specific questions—about whether Chief Judge Easterbrook sought additional protection from the Marshals or whether Turner ever tried to communicate with him. Turner elicited from Judge Bauer, moreover, that no one had tried to attack him, and the government never implied that *any* of the judges had actually been attacked. Whether a threat is ultimately carried out is, at best, of marginal relevance to whether the threat was made in the first place; indeed, the speaker need not even have intended or been able to carry out the threat for § 115(a)(1)(B) to apply. Accordingly, the district court's ruling fell comfortably within the scope of its discretion.

37

*E.*     *Turner's* Pro Se *Arguments*

In a supplemental *pro se* brief, Turner raises various other arguments attacking his conviction and sentence. We have considered these arguments and find them without merit, with the exception of his claim of ineffective assistance of counsel.

"When faced with a claim for ineffective assistance of counsel on direct appeal, we may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." *United States v. Ramos*, 677 F.3d 124, 129 (2d Cir. 2012) (internal quotation marks omitted). Due to our "baseline aversion to resolving ineffectiveness claims on direct review," we decline to consider Turner's ineffective-assistance argument at this time. *Id.* (internal quotation marks omitted). Turner may pursue this claim in a petition for writ of habeas corpus under 28 U.S.C. § 2255.

CONCLUSION

We have considered Turner's remaining arguments and find them to be without merit. Having concluded that Turner's conviction was supported by sufficient evidence, that the district court's jury instructions contained no prejudicial error, and that no other reversible error affected the proceedings, we **AFFIRM** Turner's conviction.

38

POOLER, *Circuit Judge*, dissenting:

I respectfully dissent from the majority's conclusion relating to the sufficiency of the evidence, because I find that, as a matter of law, Turner's speech was not a true threat under 18 U.S.C. § 115(a)(1)(B) and the First Amendment.

Section 115(a)(1)(B), as it "makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States*, 394 U.S. 705, 707 (1969). Although vast, "[t]he protections afforded by the First Amendment . . . are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Virginia v. Black*, 538 U.S. 343, 358 (2003); *see also Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). Relevant to this case are two such categories, "true threats," *see Watts*, 394 U.S. at 708, and "incitement," *see Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969).

When evaluating speech that is purported to lie outside of constitutional protection, we must take care in drawing the boundaries of these categories. "In defining these limited enclaves of unprotected speech, . . . we have taken great pains to preserve ample breathing space in which expression may flourish." *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1048 (2d Cir. 1979). The true threats category distinguishes true threats from purported threats that are mere "political hyperbole," even if "vituperative, abusive, and inexact." *Watts*, 394 U.S. at 708. Similarly, the incitement category distinguishes incitement from the "advocacy of the use of force or of law violation." *Brandenburg*, 395 U.S. at 447. To distinguish true threats from political hyperbole, we use an objective test, "namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of

1

injury." **[Majority Op. at 17 (quoting *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006) (internal quotation marks omitted).]** For example, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Black*, 538 U.S. at 360. To distinguish incitement from advocacy, we look to whether the communication "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447; *see also Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) (finding no incitement where the "statement was not directed to any person or group of persons").

In sum, our First Amendment analysis has true threats and incitement as two categories of unprotected speech, under which we distinguish, respectively, true threats from purported threats and incitement from purported incitement or advocacy. At issue in this case is the initial question of the category under which the speech falls. A given communication may be neither incitement nor a true threat, one or the other, or arguably even both. But before reaching any of these conclusions, we must first determine, as a matter of law, which category we are in, and whether we have an "incitement" case or a "true threats" case. Only *then* can we determine whether the speech at issue is protected under the appropriate legal test.

In many cases, this initial question is not explicitly addressed, because the form of speech makes clear that the case is either an "incitement" case or a "true threats" case. Regardless, it is undeniable that courts treat purported threats and advocacy as distinct. *See Fogel v. Collins*, 531 F.3d 824, 830 (9th Cir. 2007); *Planned Parenthood of the Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1072 (9th Cir. 2002) ("*Planned Parenthood II*"); *United States*

2

*v. Howell*, 719 F.2d 1258, 1260 (5th Cir. 1983). We must make an initial determination of the category of speech under which our analysis lies because "the constitutional question turns on the source of the[] fear." *Planned Parenthood of the Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 244 F.3d 1007, 1018 (9th Cir. 2001) ("*Planned Parenthood I*"), *rev'd en banc*, 290 F.3d 1058 (9th Cir. 2002). Application of the "true threats" test *presupposes* that the speech at issue is a purported threat and only evaluates its seriousness. *See Black*, 538 U.S. at 360 (stating that speech is a true threat if "a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death," which presumes that the communication is in form a threat). Thus, our "true threats" analysis looks to "whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury," or if the communication, while in form a threat, is constitutionally-protected political hyperbole. *Davila*, 461 F.3d at 305. A different analysis is needed to distinguish purported threats from other categories of speech.

Furthermore, in determining whether speech is a purported threat, we must make sure that the speech is not instead advocacy protected by *Brandenburg*. *Brandenburg* (incitement) and *Watts* (true threats), and their respective progeny, offer different Constitutional protections, and those afforded to advocacy would have less force if we analyzed all speech under the "true threats" test. Advocacy of the use of force, even if not incitement under *Brandenburg*, will often place the object of the advocacy "in fear of bodily harm or death," which would be "constitutionally proscribable" intimidation under *Black*. 538 U.S. at 360. Much of what is said by even nonviolent advocates can "acquire[] the tinge of menace." *Planned Parenthood I*, 244 F.3d at 1014. "[H]owever, that mere *advocacy* of the use of force or violence does not remove

3

speech from the protection of the First Amendment." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982). "Speech does not lose its protected character . . . simply because it may embarrass others or coerce them into action." *Id*. at 910. For this to be true, we must distinguish between *threats* and other forms of speech that may intimidate, menace, or coerce but are protected (unless they fall into another category of regulated speech). Political advocacy must be a form of speech that stands outside the true threats analysis.

While "the line between the two forms of speech may be difficult to draw in some instances," *Howell*, 719 F.2d at 1260, case law establishes principles to distinguish between threats and other forms of speech. First, with respect to the true threats category, "a court must be sure that the recipient is fearful of the execution of the threat *by the speaker* (or the speaker's co-conspirators)."[1] *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001). "Thus, generally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear. This may be true even where a protestor tells the objects of protest that they are in danger and further indicates political support for the violent third parties." *Id.* In other words, a threat "warns of violence or other harm that the speaker controls." *Planned Parenthood II*, 290 F.3d at 1089 (Kozinski, *J.*, dissenting). In contrast, the incitement category involves "predictions or exhortations to others"

---

[1] We have held that "it is not necessary for the Government to prove that the defendant had a specific intent or a present ability to carry out his threat, but only that he intended to communicate a threat of injury through means reasonably adapted to that purpose." *United States v. Sovie*, 122 F.3d 122, 125 (2d Cir. 1997) (internal quotation marks and brackets omitted). It *is necessary*, however, that the object of the purported threat—the person on whom the injury is to befall—is concerned with potential injury from the speaker. I take no position as to whether, after *Black*, 538 U.S. 343, we must read a subjective intent requirement into our true threats analysis. **[*See* Majority Op. at 17 n.4.]**

4

to use violence.  *See United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir. 2011).

Drawing this distinction will necessarily lead us to the syntax of the communication at issue:  "I will kill you" suggests danger from the speaker, while, "you deserve to die" suggests a prediction or exhortation.  However, "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render the statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat."  **[Majority Op. at 23 (quoting *United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994)) (internal quotation marks omitted).]**  Threats do not have to be "explicit [or] conveyed with the grammatical precision of an Oxford don."  **[Majority Op. at 24.]**  "An absence of explicitly threatening language does not preclude the finding of a threat."[2]  *Malik*, 16 F.3d at 49 (discussing 18 U.S.C. § 876).  Speech may be ambiguous as to *who* will cause injury and still constitute a threat.

As a second principle, a purported threat must be directed toward the victim.  *See Operation Rescue Nat'l*, 273 F.3d at 196.  "In most cases where courts have found that speech

---

[2] It must be remembered, however, that we are evaluating *speech* or *communication* to distinguish between advocacy and purported threats.  "The First Amendment [also] affords protection to symbolic or expressive conduct as well as to actual speech," and such conduct may also be constitutionally proscribed.  *Black*, 538 U.S. at 358.  For example, in *Davila*, we found that the defendant made a true threat when he sent a small amount of white powder in a letter labeled "ANTRAX."  461 F.3d at 300, 304-05.  In *Black*, as the majority notes, the Supreme Court held that "given the surrounding context, cross burnings may constitute unprotected threats of violence, despite the wholly *implicit* nature of the serious threat they convey."  **[Majority Op. at 21 (citing *Black*, 538 U.S. at 345, 357, 363) (internal citation omitted).]**  In *United States v. Hart*, the Eighth Circuit found that the defendant's parking of a Ryder truck at the entrance of an abortion clinic constituted a true threat, "in light of the surrounding circumstances."  212 F.3d 1067, 1072 (8th Cir. 2000).  While similar expressions or conduct may amount to a true threat, they cannot be mistaken for *advocacy*, and thus ambiguity as to the nature of the communication does not raise the same concerns.

5

constituted a true threat, the threatening speech was targeted against specific individuals or was communicated directly to the subject of the threat." *Fogel*, 531 F.3d at 830. Purported incitement, on the other hand, is directed toward third parties. *See Bagdasarian*, 652 F.3d at 1119 (describing advocacy as "predictions or exhortations to *others*") (emphasis added).

To the extent that speech is ambiguous, the distinction between "public discourse" and "direct personal communications" is "highly significant." *See Planned Parenthood I*, 244 F.3d at 1018; *see also Claiborne Hardware*, 458 U.S. at 926-27 ("Since respondents would impose liability on the basis of a public address—which predominantly contained highly charged political rhetoric lying at the core of the First Amendment—we approach this suggested basis of liability with extreme care."). "Political speech, ugly or frightening as it may sometimes be, lies at the heart of our democratic process." *Planned Parenthood II*, 290 F.3d at 1089 (Reinhardt, *J.*, dissenting); *see also Boos v. Barry*, 485 U.S. 312, 322 (1988) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (internal quotation marks omitted). "*Private* threats delivered one-on-one do not." *Planned Parenthood II*, 290 F.3d at 1089 (Reinhardt, *J.*, dissenting) (emphasis added). We have often found ambiguous speech to be a true threat when conveyed in private communication. In *Malik* the defendant sent two letters with "[a]rguably . . . ambiguous" threats, and we affirmed the jury's finding that the letters were true threats. 16 F.3d at 50. In *United States v. Shoulberg* the defendant passed a note to a co-conspirator that "carried overtones of imminent threat" toward a third person. 895 F.2d 882, 886 (2d Cir. 1990). In *United States v. White*, 670 F.3d 498, 512 (4th Cir. 2012), the defendant sent an email comparing

the recipient to Judge Lefkow—similar to Turner's invocation of Judge Lefkow in this case—and the Fourth Circuit affirmed the threat conviction under *Watts*.  **[Majority Op. at 21.]** In all of these cases, courts found true threats despite the "absence of explicitly threatening language," *Malik*, 16 F.3d at 49.  Unlike the present case, these cases all involved personal communications.

In contrast, the Supreme Court has held that even language that seems threatening may, if made in public as part of political communications, fall under the incitement category.  In *Claiborne Hardware*, speaker Charles Evers, as organizer of a civil-rights boycott, spoke out against boycott breakers during several public rallies.  458 U.S. at 902.  At one rally, he stated that boycott breakers would be "disciplined"; at another he said:  "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." *Id.*  The Supreme Court acknowledged that Evers public statements "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence." *Id.* at 927.  Nevertheless, it analyzed under *Brandenburg* and held that Ever's statements were constitutionally-protected advocacy. *Id.* at 927-29.

I do not wish to imply that a public statement can never be a true threat.  In *United States v. Kelner*, we found a true threat where the speaker said, in an interview later broadcast on television, "[w]e are planning to assassinate Mr. Arafat . . . . Everything is planned in detail." 534 F.2d 1020, 1025 (2d Cir. 1976).  While the majority correctly notes that the *Kelner* Court's threat test is dicta and that our standard is broader, **[Majority Op. at 25]**, it is notable that the *Kelner* Court found that the speech at issue was an "unequivocal, unconditional and specific expression[] of intention immediately to inflict injury."  534 F.2d at 1027.  That is to say, when

7

speech is *unambiguously* directed toward a victim, we need not look to the distinction between public and personal communications. It is in the face of ambiguity that this distinction is "highly significant." *Planned Parenthood I*, 244 F.3d at 1018. Nor do I wish to imply that a statement cannot arguably be both a purported threat and advocacy. Speech may threaten violence that the speaker controls and exhort others to act, directing the speech to both the victim and third parties. But to the extent that the speech in question is a public address, we must "approach . . . with extreme care." *Claiborne Hardware*, 458 U.S. at 927. A public statement of advocacy must be clearly in the form of a threat for us to apply the "true threats" test. Holding otherwise would insufficiently protect public discourse.

Turning to the case at hand, I would hold that Turner's communications were advocacy of the use of force and not a threat. It is clear that Turner wished for the deaths of Judges Easterbrook, Posner, and Bauer. **[Majority Op. at 4-5.]** But I read his statements, made in the passive voice, **[*see id.* at 22]**, as an exhortation toward "free men willing to walk up to them and kill them" and not as a warning of planned violence directed toward the intended victims, **[*id.* at 5.]** This reading is furthered by the fact that Turner's words were posted on a blog on a publicly accessible website, **[*id.* at 4, 8]**, and had the trappings of political discourse, invoking Thomas Jefferson's famous quotation that "[t]he tree of liberty must be replenished from time to time with the blood of tyrants and patriots," **[*id.* at 5.]** Although vituperative, there is no doubt that this was public political discourse. His speech might be subject to a different interpretation if, for example, the statements were sent to the Judges in a letter or email. *See Malik*, 16 F.3d at 50. However, Turner's public statements of political disagreement are different from a threat.

Finding that the communications were advocacy and not a threat, I dissent from the

8

majority's opinion and find that the evidence was not "sufficient to permit a reasonable jury to find that Turner's conduct constituted a threat." **[Majority Op. at 14 (quoting *Davila*, 461 F.3d at 305) (internal alterations omitted).]** If Turner's statements were in form a threat, I would not disagree with the majority's holding that the test to distinguish true threats from political hyperbole is an objective one, **[Majority Op. at 17]**; that a determination of whether Turner's speech is a true threat under this test is an issue of fact for a jury, **[*id.* at 14]**; that the district court's jury instruction in this case was proper, **[*id.* at 30-31]**; and that Turner's statements "reveal[] a gravity readily distinguishable from mere hyperbole or common public discourse," **[*id.* at 20.]** However, I do not believe that Turner's statements, although abhorrent, amount to a threat. The distinction between advocacy and threats does not turn on the gravity of speech.

From this discussion of the Constitution, I turn to the statute under which Turner was charged, Section 115(a)(1)(B), which "must be interpreted with the commands of the First Amendment clearly in mind." *Watts*, 394 U.S. at 707. Section 115(a)(1)(B) makes it a crime to "threaten[] to assault, kidnap, or murder . . . a United States judge." 18 U.S.C. § 115(a)(1)(B). It is clear that this statute proscribes true threats, but I would hold, as discussed above, that Turner's speech, as advocacy of the use of force, falls outside the true threats category of speech. Turner's speech may still be proscribed under the statute if (1) the statute proscribes incitement and (2) Turner's advocacy qualifies as incitement under *Brandenburg*.

I start with the statute. It is possible that the word "threaten" under Section 115(a)(1)(B) includes "incitement." Because "threaten" is not defined in the statute, we give the word its "ordinary, contemporary, common meaning." *See Davila*, 461 F.3d at 302 (discussing 18 U.S.C. § 876(c)) (internal quotation marks omitted). In *Davila* we noted that

9

> [a]ccording to the Oxford English Dictionary, a threat is a "denunciation to a person of ill to befall him; esp. a declaration of hostile determination or of loss, pain, punishment, or damage to be inflicted in retribution for or conditionally upon some course; a menace." The American Heritage Dictionary, Fourth Edition, defines the word as "[a]n expression of an intention to inflict pain, injury, evil, or punishment," or "[a]n indication of impending danger or harm." The same dictionary defines the word "threaten," in turn, as "[t]o express a threat against."

*Id.* It is also significant that "[n]o . . . circuit," except for perhaps the Fourth Circuit, "has concluded that incitement can be punished under a threat statute."[3] *Bagdasarian*, 652 F.3d at 1119 n.18. In light of the ordinary meaning of the word "threaten," the case law of other circuits, and the constitutional necessity to draw a line between true threats and incitement as two different categories of speech that use two distinct tests, I would hold that Section 115(a)(1)(B) does not proscribe incitement but does proscribe true threats. Turner's speech was advocacy rather than a threat, and therefore could not be a true threat.

To be clear, I need not and do not say that Turner's speech is constitutionally-protected. Turner's speech may lose Constitutional protection under *Brandenburg* and, indeed, the district court felt that it did:

> The First Amendment does not protect speech which "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *See Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 448 (1975); *Brandenburg*, 395 U.S. at 447. The Supreme Court has clearly drawn a distinction between the mere teaching of a resort to violence from instances where an individual is "preparing a group for violent action and steeling it to such action." *Noto v. United States*, 367 U.S. 290, 297-98 (1961).

> The Court finds that the Defendant's actions are sufficient to incite or urge lawlessness. Moreover, posting the victim's pictures, the exact location where they are

---

[3] In *United States v. Patillo*, the Fourth Circuit held that "an essential element of guilt" under 18 U.S.C. § 871, a threat statute, is "a present intention either to injure . . . or incite others to injure," but also added that "[m]uch of what we say here is dicta." 438 F.2d 13, 16 (4th Cir. 1971).

10

employed with room numbers, and a map to the federal building complete with indications where the "Anti-truck bomb barriers" are located, provided exact information to <u>facilitate</u> the threat."

Defendant argues that his statements were not meant to incite imminent lawlessness. As support, he notes that his comments were posted on his computer in New Jersey while the Judges were in Chicago, and that he did not actually stand outside of the Courthouse urging a group of supporters to rush the Courthouse to attack the Judges. The Court finds this argument unpersuasive. In the world in which we live, speech has no geographical boundaries. The fact that Defendant issued his statements on his blog rather than in person only served to ensure that an indefinite audience had access to his remarks, and enlarged the group of individuals subject to incitement.

The district court may be right. It is certainly true the Internet has changed the "geographical boundaries"of speech. However, as Turner was not charged under an incitement statute, I need not reach the issue here.

Accordingly, I DISSENT from the majority's opinion and would vacate Turner's conviction and remand for further proceedings consistent with the above.