OPINION OF THE COURT
Michael Gerstein, J.
“All the world’s a stage, And all the men and women merely *1072 players,” William Shakespeare famously wrote in As You Like It. The “stage” for this case is the world of who were formerly downtown Manhattan performing artists, now largely relocated to Brooklyn, particularly Williamsburg and the surrounding neighborhoods. The “players” in our case consist of the two “stars,” complainant Harry Stuckey and defendant Christopher Brodeur, and a number of supporting players, all involved in the performing arts scene as musicians, poets, filmmakers and the like.
The case centers around a large loft space at 99 Richardson Street, in Williamsburg, which Stuckey, defendant, and other performing artists were interested in obtaining to use as a venue for their artistic work, living and storage space, events and parties. After months of searching, defendant finally located the space, and raised $12,000 for the initial rent and security required by the landlord. However, defendant lacked sufficient financial resources to satisfy the landlord, so defendant ultimately turned to Stuckey, who agreed to take the lease in the name of a corporation, Y. Media Inc., of which he was president. As set forth below, Stuckey and defendant soon had a falling out, leading to the charges herein.
The superseding information sets forth one count each of three different charges, occurring between approximately January 11 and February 19, 2009. Defendant is charged with attempted aggravated harassment in the second degree (Penal Law §§ 110.00, 240.30 [1] [a]) and stalking in the fourth degree (Penal Law § 120.45 [1]), both class B misdemeanors, and harassment in the second degree (Penal Law § 240.26 [3]), a violation. The factual allegations set forth in the information are that “Defendant did repeatedly verbally threaten to kill [Stuckey], ruin [his] business and [his] life,” and that defendant “did place a poster on [Stuckey’s] front door that contained [Stuckey’s] name, a hand drawn picture of [Stuckey] and false accusations about [Stuckey] being a thief, a drug dealer and a child molester.”
The evidence in this case raises multiple issues, most importantly the juxtaposition of the statutes at issue with the First Amendment to the United States Constitution and the right of defendant to free speech. The First Amendment of the United States Constitution forbids the silencing of speech merely because it is objectionable or offensive to the listener. (Texas v Johnson, 491 US 397, 414 [1989].) Only “well-defined and narrowly limited classes . . . including] the lewd and *1073 obscene, the profane, the libelous, and the insulting or ‘fighting’ word . . . which by their very utterance inflict injury or tend to incite an immediate breach of the peace” may properly be proscribed. (Chaplinsky v New Hampshire, 315 US 568, 571-572 [1942].)
With regard to Penal Law § 240.30 (1), the line between constitutionally protected speech and prohibited actions is less than bright, and has proved problematic in application. That statute has been held unconstitutional by at least one federal court (Vives v City of New York, 305 F Supp 2d 289 [SD NY 2003], revd on other grounds 405 F3d 115 [2d Cir 2005] [with one judge dissenting and agreeing with the District Court that the statute was unconstitutional]). Our New York State courts have found the statute constitutional, but have interpreted it narrowly, to apply only “where[ ] ‘substantial privacy interests are being invaded in an essentially intolerable manner’ ” (People v Smith, 89 Misc 2d 789, 791 [App Term, 2d Dept 1977]), and only by “true threats,” sometimes referred to as those which are “clear, unambiguous, and immediate.” (People v Yablov, 183 Misc 2d 880, 886 [Crim Ct, NY County 2000].) As the Court of Appeals reiterated in People v Dietze (75 NY2d 47, 51 [1989]), speech alone may be neither forbidden nor penalized “unless [it] presents a clear and present danger of some serious substantive evil.”
While a threat must be sufficiently clear, unambiguous, and immediate (see e.g. Yablov, 183 Misc 2d 880 [complaint alleging that defendant left angry messages on her ex-boyfriend’s answering machine, including the statement “we’ll get you,” and called him 22 times in a period of 12 hours was insufficient to establish harassment or aggravated harassment where the defendant made no specific threat]; People v Limage, 19 Misc 3d 395 [Crim Ct, Kings County 2008] [complaint alleging that defendant sent six threatening text messages to complainant’s phone in less than 17 hours stating that he was outside of her residence and that she would end up in the hospital facially sufficient]), a physical threat is not an element. (See People v Little, 14 Misc 3d 70 [App Term, 2d Dept 2006].)
“A genuine threat is one that is serious, should reasonably have been taken to be serious, or was confirmed by other words or conduct.” (People v Hernandez, 7 Misc 3d 857, 860 [2005], citing People v Dietze, 75 NY2d 47 [1989].) “True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of *1074 unlawful violence to a particular individual or group of individuals.” (People v Olivio, 6 Misc 3d 1034[A], 2005 NY Slip Op 50300[U], *2 [Crim Ct, NY County 2005], quoting Virginia v Black, 538 US 343, 359 [2003].) The evidence must show that “ ‘an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury,’ whether or not the defendant subjectively intended the communication to convey a true threat.” (People v Mitchell, 24 Misc 3d 1249[A], 2009 NY Slip Op 51931[U] [Sup Ct, Bronx County 2009], citing People v Olivio, 2005 NY Slip Op 50300[U], United States v Francis, 164 F3d 120, 123 [2d Cir 1999].)
It is perhaps easier to determine what language does not meet this standard for Penal Law § 240.30 (1) than that which qualifies as a crime. For example, it is not likely that a baseball fan who tweets “kill the umpire” following a perceived missed call, or a parent on the way home who calls his or her teenage child and tells them that they will be killed if their room is not clean by the time the parent arrives, would be found guilty under the statute, even though the speaker’s words, taken at face value, would constitute an immediate threat which the listener might deem annoying and alarming, and, at least for the teenager, an intolerable invasion of substantial privacy interests. Neither the umpire nor the teenager is likely to suffer any physical harm, even if the umpire’s calls do not improve and the teen’s room remains messy.
Our jurisprudence therefore has found many statements to not be violative of the statute, as not constituting the required “true threat.” (See e.g. People v Goris, 39 Misc 3d 1217[A], 2013 NY Slip Op 50637[U] [Crim Ct, Kings County, Apr. 11, 2013]; People v Thompson, 28 Misc 3d 483, 496 [Crim Ct, Kings County, May 12, 2010]; People v Khaimov, 26 Misc 3d 1202[A], 2009 NY Slip Op 52626[U] [Crim Ct, Kings County, Nov. 2, 2009]; People v Behlin, 21 Misc 3d 338 [Crim Ct, Kings County 2008]; People v Bonitto, 4 Misc 3d 386 [Crim Ct, NY County 2004].)
Analysis
While only a single count of each of the three charges is alleged, the court will analyze separately the verbal threats and the poster referred to in the information. Significantly, the facts as to both are virtually undisputed, although defendant denies that either qualifies as a crime. Defendant freely admitted during his testimony that he stated on several occasions during the relevant time period that he might kill Harry Stuckey, and that *1075 he placed the poster at issue on Stuckey’s door. However, he denies that they were true threats, and claims First Amendment protection for both his verbal statements and poster.
A. The Verbal Threats
The uncontradicted evidence proves that defendant, during the relevant time period, verbally threatened to kill Harry Stuckey. The circumstances of this threat, as well as the poster placed on Mr. Stuckey’s door, are relevant to an analysis of whether they are actionable. It is well settled that in determining whether statements which on their face constitute an actionable threat are to be considered “true threats,” the court may consider the context in which the statement was made, as well as the response of its recipient. (People v Goldstein, 196 Misc 2d 741 [App Term, 2d Dept 2003], citing People v Prisinzano, 170 Misc 2d 525, 531 [Crim Ct, NY County 1996], quoting Chaplinsky v New Hampshire, 315 US 568 [1942].) Thus, in Watts v United States (394 US 705 [1969]) conviction was reversed against an anti-Vietnam War protester, charged under a statute prohibiting threats against federal officials, who stated that if he was drafted and issued a rifle, the first person in his sights would be President Johnson, in that the crowd hearing the protester’s speech responded with laughter.
The jurisprudence requires that even if the speech is deemed in the first instance a true threat as a matter of law, it is up to the factfinder at trial to determine whether a reasonable person would interpret the communication as a true threat. (See United States v Francis, 164 F3d 120 [1999].) Moreover, even if a reasonable person would interpret the words as a true threat, it appears at least relevant whether the intended recipient of the threat deemed the words truly threatening. (United States v Turner, 720 F3d 411 [2d Cir, June 21, 2013].) Since this case was tried to the court without a jury, the court will first analyze the words as a matter of law, and then as a factfinder, in their context, as would be interpreted by a reasonable person, and finally as to whether the recipient deemed the words a true threat.
Defendant’s words, threatening to kill Mr. Stuckey, without regard to context, are legally sufficient to constitute a threat. Defendant argues that even without context, his words are not actionable because they were equivocal and amounted at most to a conditional threat — that he would murder Stuckey only if he did not restore defendant’s role at 99 Richardson Street. The court disagrees. It is clear that it was defendant himself who *1076 would determine whether Stuckey returned him to what he perceived to be his rightful position with regard to control of the premises. Thus, defendant anointed himself judge, jury and executioner if Stuckey did not satisfactorily meet defendant’s demands, so that while the words on their face were conditional, that does not remove them from the proscriptions of the statute. In interpreting similar federal statutes which apply the same standard of whether an ordinary reasonable recipient familiar with the context of the statement would interpret it as a threat of injury, and therefore a true threat, the federal courts have rejected defense claims grounded on careful phrasing and artful use of tenses such as the passive voice in making the threat (United States v Turner), and this court similarly rejects defendant’s assertion that a conditional threat cannot violate the statute.
The court will next consider whether a reasonable person in the position of Stuckey would have deemed defendant’s verbal statements to constitute a true threat. This analysis includes consideration of the context in which the words were spoken. (See People v Mitchell, 24 Misc 3d 1249[A], 2009 NY Slip Op 51931[U] [Sup Ct, Bronx County 2009] [considering whether “an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury” (internal quotation marks omitted)].)
The evidence showed that defendant and Mr. Stuckey were involved in a deep dispute as to defendant’s role in the 99 Richardson Street project. It is uncontroverted that defendant was solely responsible for locating the space on Craigslist, and that he was also responsible for raising the initial sum of $12,000 to obtain the leasehold, although he did not himself put up the entire sum (June 13 tr at 89). For this, he believes that he was entitled to control the premises. It is also uncontroverted that defendant was himself without significant assets at the time, and that the landlord would not have entered into a lease with defendant (June 13 tr at 42). After seeking without success to induce others to go on the lease, defendant turned to Stuckey, out of desperation, as being sufficiently creditworthy for the landlord (June 24 tr at 115-117).
At this point, defendant and Stuckey had known each other for more than a decade (June 13 tr at 40), and each had experienced considerable difficulty in working with the other on various artistic projects (June 25 tr at 18-19, 42). A long-term lease was then executed for a term beginning January 15, 2009, *1077 with V Media Inc. an entity of which Stuckey was stated to be president, without any reference to defendant, for rent which apparently aggregated approximately $330,000 over the term of the lease (June 13 tr at 43). While only the first page of the lease was introduced into evidence as People’s exhibit 12, Stuckey testified that he personally guaranteed the corporate obligations to the landlord. (Id.) Based on the corporate and personal liability for rent, Stuckey believed that he, and not defendant, was entitled to control the premises, although he had not put up a penny of the initial funds required by the landlord.
Defendant, having lost his prior downtown Manhattan residence, moved into the premises immediately upon the lease being signed, and occupied one of several available rooms. Stuckey also moved in and, over defendant’s strenuous objections, occupied the largest room to store his film equipment, including a film crane (June 13 tr at 46; June 24 tr at 143-144), without payment, while maintaining his other location on nearby Havemeyer Street as well as his home on Long Island. Defendant strenuously objected to this, as it was defendant’s plan to rent out the seven planned bedrooms in the space to other performing artists (June 24 tr at 22-23), and thus obtain the funds to pay the monthly rental due the landlord (June 24 tr at 45; June 26 tr at 18).
Less than a month later, on February 14, 2009, Stuckey evicted defendant without benefit of legal process, by self-help, changing the locks on the premises and moving defendant’s belongings into storage (June 19 tr at 46). While defendant had insisted that there be what he called a board of directors of approximately 10 people (June 13 tr at 50), all of whom were performing artists and most of whom were chosen by bim (June 19 tr at 15), to oversee the premises, it appears that the “Board” had no legal authority, and, worse for defendant, did not block or even strenuously object to defendant’s removal (June 24 tr at 22-30; June 25 tr at 127). It was during this time, particularly at two “Board” meetings of the 99 Richardson Street group, as well as at other places, that defendant stated he would kill Stuckey if defendant was not returned to occupancy, if not control of the premises. (The testimony of several witnesses was that the “Board” meetings were more akin to parties, with the participants being in various states of intoxication.) (June 25 tr at 26, 29, 34.)
As noted, Stuckey and defendant had known each other for over a decade by this time. Thus, as all of the witnesses testified *1078 (defendant called as witnesses four of the “Board” members), Stuckey was well aware of defendant’s penchant for turning on everyone with whom he came in contact, and his penchant for scathing, demeaning verbal and written broadsides threatening to expose their alleged wrongdoings to the artistic community if they did not accede to his demands. (June 24 tr at 24, 27, 50-51, 54-55, 84-85, 128-129.) And, while the court has no cause to determine what rights, if any, defendant had in the premises based on being both the finder and the one who raised the initial sum necessary to obtain the lease, while Stuckey put up only his credit without any monetary contribution, the court holds that a reasonable person in Stuckey’s position should have realized that defendant would become incensed upon Stuckey removing him from the premises by changing the locks, and should have expected a harsh response from anyone who had been locked out, let alone from defendant whom Stuckey well knew to be harsh in his treatment of even his best friends (June 24 tr at 27, 68-69, 75, 114).
It is also significant that defendant’s verbal threats of murder against Stuckey were also coupled with his threats to then commit suicide. Several witnesses, including defendant and Stuckey himself, testified that long before the events at issue, defendant has repeatedly threatened to kill himself, bemoaning numerous matters personal to him, as well as evils of the world. (See e.g. June 13 tr at 65; June 19 tr at 48, 114; June 24 tr at 144; June 25 tr at 48.) Defendant’s emails during the time at issue also mentioned suicide, without reference to murdering Mr. Stuckey[1] (notwithstanding the People’s attempt to describe them as including a threat of murder and sometimes with reference instead to other methods of embarrassing Stuckey, for which Stuckey would have to remain alive).[2] (June 13 tr at 84-86.) During defendant’s testimony, he again referred to the possibil *1079 ity of suicide as a result of numerous perceived personal and worldly affronts. It might well be said of defendant, as Anton Chekhov wrote: “I’m in mourning for my life.” (Chekhov, The Seagull, Act I [1896, translated by Elisaveta Fen, 1954].)
The court also takes note of defendant’s artistic endeavors, as he testified to being a poet, songwriter and artist, along with his self-proclaimed status as a journalist, muckraker, activist and gadfly, including, by his own account, as being the number one enemy of both the present and prior mayor (see People’s exhibit 3; June 19 tr at 72-73), if not the District Attorney as well. (June 26 tr at 49.) (Defendant has been arrested many times, all, according to him, as a result of his numerous protests.) All this, too, was known to Stuckey at the time at issue. (See June 18 tr at 24 [“(E)verything about you is a threat. That’s what you are. That’s what you have been doing for the last twenty years of your life statement, threatening people”].) Based upon the credible evidence, the court holds that Stuckey also knew defendant’s propensity for exaggeration of every perceived wrong (June 24 tr at 92) in aid of making whatever point he desired at that moment (June 24 tr at 128-129). Thus, Stuckey testified that anyone who was the subject of defendant’s ire was labeled a child molester and rapist. (Stuckey further testified, however, that the appellation of drug kingpin which he received from defendant was unique to him.) (June 13 tr at 58-59; June 17 tr at 77.)
It is further apparent that Stuckey himself did not take defendant’s verbal threats of murder as being serious. While Stuckey testified that he took out insurance on 99 Richardson Street as well as reviewed his other insurance, changed his locks and even installed a security system, that testimony was far from convincing. Stuckey provided no policies or other documentation to support this testimony, and was unable to tell how soon after defendant’s threats he took out insurance (June 13 tr at 51-53). The court notes that any reasonable person with potential liability for premises which were to be used, among other things, for parties with 400 or 600 attendees for which admission was to be charged (see below) would be well beyond foolish not to have adequate insurance. And it is far from clear that the purpose of the security was to protect anyone from physical harm (see People’s exhibit 7 at 4), rather than to prevent defendant from reentering the premises by means of the same kind of self-help as exercised by Stuckey in removing him.
*1080 Similarly, the email exchanges between defendant, Stuckey and the other participants in the Richardson project evidence that Stuckey did not deem his life in danger. Rather, the emails show, first, that Stuckey attacked defendant with about as much vehemence and venom, save only for the threat of murder, as defendant attacked Stuckey. (See e.g. People’s exhibit 7.) Second, it appears that Stuckey, and the other participants as well (June 19 tr at 120, 126), were more focused on defendant’s threat to commit suicide than on any threat of murder. Thus, Stuckey wrote in an email to defendant and the other 99 Richardson participants that defendant’s threats were “all just angles he is using to get control and none of them are working” (People’s exhibit 7), and if defendant went through with his threat to commit suicide, the major beneficiaries would be Mayor Bloomberg and former Mayor Giuliani, who would “laugh for years” and that defendant’s suicide would “give Rudolph Giuliani birthday and Christmas gifts for the next twenty years” (People’s exhibit 7 at 17), while not mentioning any effect Stuckey’s threatened demise might have on the project or its other participants. Jessica Delfino, another of the participants, wrote in an email dated February 15, 2009, that defendant should “stop trying to use suicide and murder and all this grim shit as manipulation tools for me and others to do as you want us to do.” (People’s exhibit 3 at 3.) Moreover, Stuckey seems to be himself somewhat oversensitive to defendant’s words. Thus, Stuckey testified: “Everything during this period coming from [defendant] to me could be considered threatening, everything, the word hello is threatening.” (June 17 tr at 91.)
Stuckey’s prompt reporting of defendant’s threats to the police could be seen as evidence that he took seriously defendant’s words threatening murder. However, upon closer analysis, it becomes apparent that both Stuckey and defendant endeavored to use the criminal laws to obtain whatever advantage they could muster, without cost, in their fight against the other. Defendant repeatedly called the Fire Department after he was evicted, with complaints of overcrowding (according to defendant), and that girls were being raped or thrown off the roof of the premises (according to Stuckey). (June 17 tr at 22, 26-28.) These complaints of course brought an immediate response, which several times resulted in the premises being shut down for overcrowding (June 17 tr at 27), if not other violations deemed imminently dangerous to public safety, and at least once resulted in Stuckey’s arrest. (June 17 tr at 11.) Stuckey *1081 testified there were as many as 600 attendees in a space of about 3,800 square feet (June 17 tr at 19-20), meaning barely six square feet for each partygoer who was charged admission (June 17 tr at 25), and conceded that he was arrested at least once for, in his words, having an overcrowded party (June 17 tr at 18).
Stuckey, for his part, reported defendant’s threats to the police, initially in advance of what he perceived to be defendant’s seeking police assistance. Stuckey testified that he first came to the police, telling them to expect a “crazy man,” meaning defendant, to come in to file a complaint against him (June 13 tr at 54). Stuckey also threatened to have the other participants in the Richardson Street project arrested. (June 17 tr at 71; June 24 tr at 30, 127; defendant’s exhibit Q at 3-4.) In these circumstances, the court concludes that Stuckey’s motives, at least in part, were to have defendant arrested, and thus be silenced. (See People’s exhibit 7 at 9 [“If Chris implodes and appears at any of my locations screaming at the top of his lungs, I call the police . . . they promptly arrest him and he goes back into the system and back to Rikers Island”]; id. at 14 [“Christopher has threatened to take me to court. If he choses (sic) this dumb path, the consequences are that ... he immediately gets carried away in cuffs and goes back to Rikers Island”].)
Mr. Stuckey’s demeanor while testifying did not support a finding of credibility. He had to be repeatedly reminded to limit his answers to the questions asked, rather than launching into ad hominem attacks against defendant unresponsive to any question. (See e.g. June 13 tr at 44, 92, 96, 97; June 17 tr at 72; June 18 tr at 31.) Thus, Stuckey volunteered, in a not-too-subtle effort to inflame the court, and perhaps defendant’s legal advisor (June 18 tr at 5-8), that defendant was a holocaust denier (June 17 tr at 100-101, repeated again at June 18 tr at 27), and further volunteered his opinion, not responsive to the question, about a party before any time at issue in this case at a prior space in the Dumbo neighborhood in Brooklyn, where defendant allegedly set fire to a car (June 17 tr at 21).
The court finds Stuckey to be a self-interested witness. Defendant has commenced suit against Stuckey, and has been awarded a judgment against Stuckey in a small claims action, which judgment remains unpaid since 2009. (Defendant’s exhibit W) Mr. Stuckey did not add to his credibility by first denying any knowledge of the small claims judgment, until confronted with his own email where he asserted that the judgment *1082 would soon be vacated (June 17 tr at 42-45). Defendant also asserts to having commenced a Supreme Court action against Stuckey (June 19 tr at 50), which defendant claims he defaulted upon while incarcerated (June 17 tr at 54-57). Additionally, Stuckey admitted that while he himself was incarcerated for overcrowding the Richardson Street premises (June 17 tr at 18), he wrote an agreement from his cell in the precinct to establish a college scholarship for the child of a police officer in the precinct. (Defendant’s exhibit C; June 13 tr at 96; June 17 tr at 11-17.) Moreover, the initial complaint in this action, verified under penalty of perjury by Stuckey, asserted that there were 30-40 threatening emails sent by defendant. As defendant was unable to produce that quantity of emails containing threats (see defendant’s exhibit H; June 17 tr at 65-66; June 24 tr at 98-99), and subsequently conceded that what he had initially characterized as threats were lies, albeit “very disturbing” (June 17 tr at 69), rather than threats, the People were required to serve a superseding information which did not reference any emails. For these reasons, among others, the court cannot credit so much of Stuckey’s testimony as lacks corroboration, or documentation.
In view of the foregoing, the court is constrained to hold that defendant’s verbal statements that he would kill Mr. Stuckey would not be taken by a reasonable person in Mr. Stuckey’s position to constitute true threats, and were not taken by Mr. Stuckey to constitute anything more than the hyperbole and exaggeration which he well knew at the time the words were spoken were defendant’s hallmark and stock in trade. Therefore, the People have not proved beyond a reasonable doubt that the verbal threats constitute any crime.
B. The Poster
The second act which is the basis of the charges against defendant is his poster, admittedly placed on the door of Stuckey’s Havemeyer Street premises. The poster (People’s exhibit 1, a copy of which is appended to this opinion) includes a drawing or caricature of Stuckey, in the form of a “wanted” poster, which states, in large print:
“WANTED!
“CALL 911 IF YOU SEE THIS MAN!
“HIS NAME IS HARRY STUCKEY AND
“HE IS A VIOLENT DRUG DEALER AND
“CHILD MOLESTER/RAPIST. CALL 911.”
*1083 It is then stated in smaller print: “He drives a metallic red Cadillac car with a missing front taillight (and he has a suspended license). Do not approach this criminal. Dial 911.” On one side of the poster, defendant wrote: “Your whole block and the NYPD are going to find out about what you did. Next I flood your favorite restaurants w/pix of you! Give me back my space or we ruin each others’ lives! (The next image won’t be so flattering!)” Defendant then appended the signature of “Leroy Bones,” which is a name he uses in certain artistic endeavors (June 17 tr at 98; June 19 tr at 84).
The court will now consider whether the poster can support any of the charges against defendant. Unlike the verbal statements of defendant, the poster contains no threats that defendant would personally subject Stuckey to bodily harm. Furthermore, the court is not concerned with the truth or falsity of its contents (Stuckey denied all of its allegations except that his license had been suspended and that he drove the specified car), but only whether it is proscribed by the statutes at issue. Nevertheless, the court holds that the words of the poster, coupled with defendant’s concession that he placed the poster on the door of Stuckey’s residence, are sufficient, at least on their face, as a matter of law, to constitute a crime and not run afoul of the First Amendment.
The poster, unlike defendant’s verbal threats, does not portend any physical harm[3] to Stuckey, but its words nonetheless constitute a threat — that anyone observing the poster and seeing Stuckey would in fact call 911 to report the sighting of a “violent drug dealer and child molester/rapist,” which well might lead in turn to at least the apprehension of Stuckey by the police, not to mention the possibility of physical harm during that apprehension. Such a threat is different in nature than defendant’s statements that he would kill Stuckey, but it is just as much, if not more so, a threat. While Stuckey’s murder was threatened only by defendant, it is possible that any person seeing both Stuckey and the poster, and unaware of the context, might call the police. For that reason, even taken in the context set forth in the court’s analysis of defendant’s verbal statements, the court holds that, unlike the verbal statements, the poster constitutes a “true threat,” in that a reasonable person in Stuckey’s position, seeing the poster, would deem the poster to constitute a real threat that he might be arrested at any mo *1084 ment, and perhaps suffer physical harm if the police considered him to be a “violent drug dealer and child molester/rapist.” Therefore, in contrast to our analysis of defendant’s verbal statements, defendant’s propensity for hyperbole and exaggeration, as known to Stuckey, does not save him from liability for the poster.
While the court holds that the People have not proved beyond a reasonable doubt that a reasonable person in Stuckey’s position would have considered defendant’s words threatening murder to be a true threat, that same reasonable person would have considered the possibility of arrest if anyone acted on the poster to be such a threat. Additionally, even considering that the court did not find Stuckey to be a wholly credible witness, the court will credit so much of his testimony as set forth that he was made alarmed, afraid and annoyed upon seeing the poster on his door. The court further finds that it was defendant’s purpose and intention to annoy and alarm Stuckey by means of the poster.
Although defendant asserts that his poster is protected by the First Amendment, the court is not criminalizing speech, whether verbal or written. Here, by placing the poster on the door of Stuckey’s Havemeyer Street premises, as opposed to distributing it to the community at large, defendant has gone beyond speech into prohibited action. (See People v Goldstein, 196 Misc 2d 741 [2003]; cf. People v Dupont, 107 AD2d 247 [1st Dept 1985] [conviction for violation Penal Law §§ 110.00 and 240.30 reversed where offensive literature publicly distributed without interference with complainant’s privacy].) Under some circumstances, privacy rights plainly outweigh free speech rights of an intruder. (People v Shack, 86 NY2d 529 [1995]; see also United States v Turner, 720 F3d 411 [2013] [where the dissent was based, in part, on the fact of the threat being disseminated to the public rather than directly to the subject].) It is the act of placing the poster on Stuckey’s door, and not merely the contents of the poster, that constitutes the crime. Placing this poster on Stuckey’s door constituted both an “essentially intolerable invasion of [Stuckey’s] zone of privacy,” as well as a true threat. Moreover, it is unnecessary to credit Stuckey’s testimony, except to the limited extent set forth above, in order to find the defendant guilty regarding the poster. Its words, importuning observers to call 911 to procure Stuckey’s arrest as a violent criminal, speak for themselves, and defendant freely conceded that he wrote the poster and placed it on Stuckey’s door, thereby invading Stuckey’s privacy in an essentially intolerable manner.
*1085 Conclusion
Defendant is guilty of violating Penal Law §§ 110.00 and 240.30 (1), attempted aggravated harassment in the second degree, but only with regard to the poster and not his verbal statements.
The crime of stalking in the fourth degree, Penal Law § 120.45 (1) requires a “course of conduct . . . likely to cause reasonable fear of material harm to the physical health, safety or property of such person.” The court finds that defendant’s verbal statements, other than the poster, would not cause a reasonable person in Stuckey’s position to reasonably fear such harm. Accordingly, as the poster constitutes only a single such act, the People cannot prove a course of conduct as is required by this statute, and defendant is therefore found not guilty of this crime.
Penal Law § 240.26 (3), a violation and not a crime, requires proof that the defendant “engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.” This is a much lower threshold than that required for aggravated harassment. Here, the court finds that while defendant’s conduct “seriously annoyed,” if not alarmed the complainant, the conduct had a legitimate purpose — to seek restoration to what he believed to be his proper role in the 99 Richardson Street premises and project from which he was ejected by Stuckey’s unilateral changing of the locks. Moreover, the court notes that unlike subdivisions (1) and (2) of Penal Law § 240.26, which require only a single act, subdivision (3) which is charged in this case requires a course of conduct or repeated acts. It cannot be said that one who is evicted by self-help may be found guilty under this statute by demanding reinstatement, even if that demand is repeated, and even if the evictor is alarmed or seriously annoyed by that demand. Accordingly, defendant is found not guilty of violating Penal Law § 240.26 (3).

. The emails were presented as People’s exhibits. (People’s exhibit 2 [“the thing I fear most in this world is continuing to live in it . . . you (Stuckey) even told a bunch of people you ‘saved’ me from committing suicide last year, dummy ... I have come within seconds of stabbing myself with a steak knife many times in the last week b/c I’ve despised the world since I was a little boy”]; exhibit 3 at 8 [“I’d be insane if I was not suicidal in a world where evil triumphs over good a million times a day”]; exhibit 5 [“You have also pushed me to the brink of suicide unlike (former mayor) Giuliani”]; exhibit 6 [“I have never liked this planet and have wanted to die since I was ten”]; exhibit 11 [“I’m ready to commit suicide b/c nice guys finish last, while crooks like Harry always win”].)

. But cf. People’s exhibit 13 (“I told everyone I was close to murdering HS and I am not joking. And then kill myself or make art in jail”).

. A physical threat is not an element of Penal Law § 240.30 (1). (People v Little, 14 Misc 3d 70 [App Term, 2d Dept 2006].)